## M. E. Walbridge Agency, Inc. et al v. The Rutland Hospital, Inc.

[186 A.2d 179]

March Term, 1962

Present: Hulburd, C. J., Holden, Shangraw and Barney, JJ.

Opinion Filed May 1, 1962

Reargument Denied November 15, 1962

*Bloomer & Bloomer* for the plaintiffs.

*John D. Carbine* for the defendant.

**Hulburd, C. J.** The plaintiff is a real estate broker. He is seeking to collect a commission which he says is due him. In support of his action, at the trial below, he presented evidence tending to show that early in 1956 Mr. Hinsman, president of the defendant hospital, contacted him and said that the hospital had decided to sell a certain business block which it owned in the city of Rutland and would the plaintiff be interested in trying to find a buyer. The plaintiff's reply was that he would be interested on a standard commission basis of 5%. In the course of this talk, it was brought out by Mr. Hinsman that the property was under lease to one Freeman. Moreover, this lease gave the tenant an option to buy. The lease expired May 31, 1960, but was renewable for a further period of ten years. Specifically,

it gave the tenant an option, during the term of the lease, or any renewal, "to purchase the property at any figure tendered by any other party in a bona fide offer and acceptable to the lessor."

At a later date in the fall of 1956, the plaintiff and the defendant's president had further talk relative to the sale of the hospital's business block in which the president directed the plaintiff to ask $150,000 for the property. At this point we quote directly from the transcript:

Q. Now, what else was said at that time with reference to your work and what you were to do?

A. I raised the question with Mr. Hinsman relative to the option which the hospital had given to Mr. Freeman and called to his attention it was very unfair for me to be putting in a lot of work trying to find a buyer for $150,000 or thereabouts only to find that Mr. Freeman could step in any time he wanted to and take it over and I would be left out in the dark. I suggested to Mr. Freeman (sic Hinsman) the only fair thing as I saw it if I provoked a sale by finding someone willing, ready and able to buy that he should protect me in case Mr. Freeman came in and took up the option at the same price.

Q. And what did he say to that?

A. He was agreeable to that.

The plaintiff did not rest at this point of the interview, but pressed the defendant's president further as follows:

Q. You say he was agreeable?

A. He said yes. I then asked him if he was negotiating with the Freemans on the purchase and sale. He said, no, he wasn't. I then asked him if he had any objection to my contacting Mr. Freeman to see if I could make a sale to the Freemans. He said it was perfectly O.K. for me to go ahead and talk with Mr. Freeman.

Pursuant to this understanding, the plaintiff testified that he talked with Mr. Freeman on two different occasions. Both talks occurred at the plaintiff's office. The dissenting opinion calls attention to the fact that the plaintiff went on to testify that the Freeman holding the option was associated in business with his son, Martin Freeman, and the two of them carried on their business in the building in question.

It was the younger business associate, Martin Freeman, that the plaintiff contacted after he had received permission to negotiate with "the Freemans." The defendant at no time during the trial, or in this Court, has sought to distinguish between the father and son in this transaction and made no objection based on such a distinction. It is not for this Court to predicate error on an artificial basis of this sort which the parties themselves did not develop, and, if developed, would in all probability leave the situation unchanged. Construing the evidence in the light most favorable to the plaintiff, we cannot say that the case should be turned on this point, nor has the defendant claimed for it the effect given it in the dissent. We do not seek to construe error into the record.

Pursuant to this talk, the plaintiff talked with the tenant, Mr. Freeman, on two different occasions at the plaintiff's office.

The plaintiff also made efforts in other directions. As a result he secured an offer of $90,000 for the property from one Poorvu, by a letter dated April 8, 1957. This offer was transmitted to the hospital. No other offer was transmitted to the hospital by the plaintiff.

On August 7, 1957, the property in question was conveyed by the hospital to the tenant, Freeman, by a deed of that date. This was without any notification to the plaintiff. In fact, the first that the plaintiff knew of the sale was through a fellow realtor who informed the plaintiff concerning it on the 27th of August, 1957. The price secured by the hospital for the property does not appear in evidence, but the plaintiff did testify that he knew that it sold for substantially more than the $90,000 offered by Poorvu.

With the evidence standing as we have stated it, the defendant moved for a directed verdict, arguing that there had been disclosed no legal ground for imposing liability upon the defendant. The motion was denied, and the trial court submitted the case to the jury which returned a verdict for the plaintiff. The defendant has not briefed for this Court any exceptions to the trial court's instructions to the jury. The sole question before us, therefore, is whether the trial court was in error in refusing to direct a verdict in the defendant's favor on the evidence before it.

The gist of the defendant's contention may perhaps be best summarized by the following language from the defendant's brief: "Walbridge never produced a buyer which put Freeman in a position

where he had to go ahead and exercise his 'first refusal' and purchase at the same price or lose out on his right to buy the premises." The defendant points out that Freeman took up his option at a substantially higher price than that of the Poorvu offer. Therefore, the defendant argues, the plaintiff has failed to perform in accordance with the terms of his own undertaking and so has no basis for recovery.

It will be noted, however, that this argument is directed to that portion of the conversation, quoted above, between the plaintiff and the hospital's president in which the defendant agreed to protect the, plaintiff if the latter found someone ready, willing and able to buy and Freeman then "came in and took up the option at the same price." The remainder of what was said at the interview is not to be disregarded, but must be considered in conjunction with what preceded it. The plaintiff inquired if the hospital was negotiating with Freeman and was told it was not. The plaintiff then asked if the hospital had any objection to his contacting Freeman to see if he could make a sale to him. He was told that this would be all right and to go ahead. We think that the jury would be justified in considering that when the plaintiff made this inquiry, he was in effect asking: If I can bring about a sale to Freeman, will he be my customer, in other words, will he be regarded the same as any other customer I may produce. The jury could properly find that he was assured that he would be. There is nothing in the evidence indicating that this assurance was ever terminated. When the plaintiff contacted Freeman, it became as if the property were being brought to his attention for the first time by the broker. This being so, the situation is tantamount to one in which the owner steps in and conducts the final negotiations, culminating in a sale, with a customer produced earlier by the broker. It then becomes a question of whether the broker had ceased to negotiate a deal with that particular individual and had completely broken off and terminated all negotiations in that direction prior to the sale closed by the owner. See *Andrews* v. *Newton*, 118 Vt. 290, 108 A.2d 517 in conjunction with *Strout* v. *Wooster*, 118 Vt. 66, 73, 99 A.2d 689. So here, the jury could properly find that this was not the case: there were no circumstances appearing in evidence requiring such a determination. The problem of procuring cause—always a difficult one—became essentially the same in this situation as in *Andrews* v.

*Newton, supra.* In the circumstances, the intervention of the defendant, after the plaintiff had initiated negotiations, could give rise to inferences at once favorable to the plaintiff and unfavorable to the defendant. The defendant has not seen fit to meet them. It was for the jury to consider such inferences as they thought arose from the situation and say whether the plaintiff was the procuring cause of the transaction between the hospital and Freeman, or whether it came about in a manner unrelated to the plaintiff's efforts. We cannot say that there was no evidence upon which the jury could have based its determination. The defendant's claim of error is not sustained; the motion for a directed verdict was properly denied.

*Judgment affirmed.*

**Holden, J.,** dissenting. To my mind liability has been invoked against the defendant on conjecture rather than fact.

The agreement of the parties developed in three steps. At the outset, there was a mere listing of the Stern's property with the plaintiff on five percent commission for sale at $150,000, without mention of the lease and option held by Frank Freeman. At a later date, when this complication was called to the plaintiff's attention, he sought and obtained protection from a situation that might develop in the event the plaintiff produced a purchaser who was ready to purchase at a price acceptable to the defendant but was prevented from completing the transaction by Freeman's meeting the proposed price and taking up his option. Lastly, the plaintiff inquired of the defendant's president "if he had any objection to my contacting Mr. Freeman to see if I could make a sale to the Freemans. He said it was perfectly O.K. for me to go ahead and talk to Mr. Freeman."

Although the agreement between these parties was loosely composed, one thing is clear. That is, the plaintiff was to be entitled to a commission of five percent of the sale price if he became the procuring cause of the sale. This was so whether the broker acted directly as an intermediary between the defendant and the final purchaser, or indirectly by producing a bona fide offer, acceptable to the defendant which forced the tenant Freeman into exercising his option. This is the plain import of the language ·of the parties and this is the standard of performance required by the law. *Dindo* v. *Cappelletti,* 116 Vt. 403, 405, 77 A.2d 840; *Home Realty Agency* v. *Nadeau,* 96

Vt. 167, 169, 118 Atl. 523; *Oben* v. *Ducharme,* 93 Vt. 211, 218, 106 Atl. 777; 4 Williston Contracts, §1030 A (Rev. Ed.).

The case was apparently tried on the theory that the plaintiff's procurement of the Poorvu offer of $90,000 was the efficient cause of the sale. In fact, the compensation recovered, as expressed in the verdict, was based on five percent of this offer. However that may be, the opinion of the majority recognizes that this effort by the plaintiff did not constitute performance. When measured against the terms of the agreement this was not an offer acceptable to the defendant nor was it in the same amount paid by Freeman. Neither can it be said that this offer contributed to the cause of the sale for the plaintiff's evidence fails to show that Poorvu's offer was ever communicated to Freeman.

The majority opinion diverts from this theory of the case and justifies the final result on the strength of the defendant's permission to the plaintiff to try to make a sale to Freeman. In effect, the majority holds this to be a total relinquishment of the defendant's right to negotiate with its own tenant and optionee, conferring upon the plaintiff the exclusive privilege of sale to this prospect. From this premise, it is concluded that when the plaintiff contacted Freeman, it was the same as though the property were being brought to the tenant's attention for the first time.

In so doing, the majority reads into the oral contract between the parties important factors that are not in the record. Moreover, to credit the plaintiff with bringing these parties together for the first time is to ignore Freeman's lease with the defendant and overlook the tenant's interest in purchasing the property which is expressed in the option. It adopts a legal fiction that is not in keeping with the facts.

Yet even if the fiction prevails, the assumption that the broker first interested Freeman in buying the property is not enough to constitute him as the procuring cause of the sale. *Strout* v. *Wooster,* 118 Vt. 66, 77, 99 A.2d 689; *Kacavas* v. *Diamond,* 303 Mass. 88, 20 N.E.2d 936, 938; *Leight-Benson Realty & Construction Corp.* v. *J. D. Stone & Co.,* 138 Va. 511, 121 S.E. 883, 43 A.L.R. 1100, 1101. Although the broker's efforts need not be the sole cause of the sale, it is essential that they dominate the transaction and amount to something more than an incidental or contributing influence. If it were otherwise, every broker who has any concern with the property might

earn separate commissions on a single sale. *John T. Burns & Sons, Inc.* v. *Hands*, 283 Mass. 420, 186 N.E. 547, 548; 12 C.J.S. Brokers, §91, p. 209.

In the present case the most that has been shown is that the plaintiff talked to the tenant's son, Martin Freeman, on two occasions. The substance of these conversations is not disclosed. Neither does it appear that they were communicated to the elder Freeman who held the lease and option.

The mere listing of property with one broker or conferring upon him the right to sell does not deprive the owner of the privilege of accomplishing a sale of the property through his own efforts, or those of another broker. *Kimball* v. *Hayes*, 199 Mass. 516, 85 N.E. 875, 876; *Brinson* v. *Davies*, 105 L.T.N.S. (Eng.) 134; 9 Am. Jur. Brokers, §57; see also collected cases in 10 A.L.R. 814 and 20 A.L.R. 1268. He will be liable only where he has interfered in bad faith with the broker's efforts. *Ritch* v. *Robertson*, 93 Conn. 459, 106 Atl. 509, 513, 7 A.L.R. 81; 8 Am. Jur. Brokers §189, p. 1100; annotation 43 A.L.R. 1111. On the facts submitted there is no evidence of bad faith and the presumption is against it. *Dunnett* v. *Shields and Conant*, 97 Vt. 419, 430, 123 Atl. 626; *Patch* v. *Squires*, 105 Vt. 405, 409, 165 Atl. 919; *Kendall's Admr.* v. *Roseberry*, 120 Vt. 498, 501, 144 A.2d 836.

I fail to see how a jury could justly determine from the evidence at hand that the plaintiff was the procuring cause of the sale to Freeman. The proof is equally deficient to justify a finding that the plaintiff achieved the sale to Freeman, but has been deprived of an earned commission by any wrongful interference by the defendant. In my judgment the plaintiff failed to sustain his burden of proof and a reversal should be ordered.

## On Motion for Reargument

**Hulburd, C. J.** Upon the handing down of the opinion in the above case, the defendant moved for, and was granted, leave to reargue.

The entire court is agreed that no points not previously considered have been presented. *Let full entry go down.*