# Gerard Giroux v. Antonio Lussier

[ 238 A.2d 63 ]

October Term, 1967

Present: Holden, C.J., Shangraw, Barney, Smith and Keyser, JJ.

Opinion Filed December 5, 1967

Reargument Denied January 25, 1968

*Lee E. Emerson* for the plaintiff.

*Davis, Martin & Free* for the defendant.

**Holden, C.J.** Both parties to this controversy are real estate brokers. The plaintiff seeks recovery on a claim that the defendant fraudulently interfered with his brokerage contract with the owner and seller of a farm in Newport, Vermont. At the conclusion of the plaintiff's case the trial court directed a verdict in favor of the defendant. This appeal by the plaintiff challenges several subordinate rulings, but the principal question concerns the directed verdict. To test that ruling, the facts are related without regard to conflicts in the evidence, but according to the full strength of the plaintiff's case.

The plaintiff became a licensed real estate broker in December 1965. He devoted only part of his time to this occupation. His regular employment was selling household supplies. While so engaged, he called at the farm of Mr. and Mrs. Gerard Rondeau in Newport on May 18, 1966. Mrs. Rondeau told him that she and her husband wanted to sell their farm. As a result of the discussion which followed, the Rondeaus signed a written agreement listing the property with the plaintiff.

The contract employed the plaintiff to sell the 350-acre farm with livestock, farm machinery and sugar bush, at the listed price of $68,500 —or at a price and terms acceptable to the sellers. The agreement also provided:

> "If you procure a purchaser as defined above, I (the sellers) agree to pay you a commission of 5 percent of the selling price. I reserve the right to sell the property to a buyer procured by myself or through another agent and in such case no commission or other charge shall be due you, provided such sale or transfer is

not made directly or indirectly to or through your prospect.

This Agreement is irrevocable but shall terminate with the sale of the property or by giving you a withdrawal notice in writing which shall become effective thirty days from the date you receive it. This Agreement shall expire one year from date without notice unless otherwise terminated as above, or unless I renew or extend it in writing. However, if within one year after the termination date of this Agreement, I sell or transfer this property to a prospect procured by you prior to its termination, I shall pay you your commission."

The next day the plaintiff tried to contact the defendant's son, Roger Lussier, by telephone to interest him in the purchase of the Rondeau property. On hearing that Mr. Lussier was conducting an auction sale near Island Pond, the plaintiff proceeded to that location. Mr. Lussier was busy auctioning property and was not available. Recognizing the defendant, the plaintiff asked him if Roger was his son. When the defendant answered he was, the plaintiff informed the defendant that he was a real estate broker, that he had come to see Roger about a farm he had for sale and asked if he could leave a message for Roger with the defendant. The defendant replied "Sure, what is it?" Whereupon the plaintiff proceeded to identify the Rondeau farm, its owners, the location and the nature of the property offered for sale.

The defendant inquired further about the price and the plaintiff told him the price specified in the listing agreement. The plaintiff requested the defendant to let him know if Roger was interested to see the farm and he would show it to him. He gave the defendant his real estate card. The defendant responded—"I'll tell him as soon as the auction is over."

While the plaintiff was visiting with an acquaintance at the auction, the defendant beckoned him back. The defendant then informed the plaintiff that he also was a real estate broker. The defendant then asked if he knew whether the Rondeau property had been listed with a broker named Angeline Roberts. When the plaintiff answered in the negative, the defendant instructed the plaintiff not to tell her because he knew a person in Stowe who had just sold his farm to a doctor for a good price. He told the plaintiff that the farmer had retained his herd and might be interested in buying the Rondeau property. The defendant then suggested that he had worked with other brokers and split fifty-fifty. He then inquired—"If this man is interested, and I

bring this man to you, if we make the sale, will you give me half the commission?" The plaintiff indicated he would. The defendant went on to inquire what Rondeau was asking for the bare farm. The plaintiff told the defendant he didn't know, but would try to find out that evening.

The plaintiff followed through with a visit to the Rondeaus the same evening. He informed them that he had talked to another broker that day who knew a prospect who might be interested in the bare farm. They named two prices for the bare farm: $52,000 including barn cleaner, milking machine and bulk tank, and $50,000 without this equipment.

He reported this by telephone to the defendant the same night. The defendant inquired if he could bring this prospect, if he were interested, to the Rondeau farm on the following Saturday. The plaintiff indicated he could show the farm at that time, if he knew about it before eight o'clock Saturday morning. The defendant assured him he would let him know. That he never did—is understandable. The town clerk of Stowe testified that there were no farms sold in Stowe during 1966.

On May 27, following this conversation, Mrs. Rondeau called the plaintiff to tell him to cancel the listing contract for they had sold the property to a Mr. Lussier. On learning this, the plaintiff called the defendant to inquire if his son Roger had purchased the property. The defendant was evasive. He replied that he had been away on a long trip and there were some fifty Lussiers in the area and it could be any one of them. This communication generated into a heated discussion that included a remark by the defendant to the effect that the plaintiff had only graduated from the eighth grade and he had a lot to learn.

While the plaintiff was awaiting word from the defendant, Roger Lussier sent his brother Noel to look over the property. This occurred three or four days after the plaintiff had contacted the defendant and before Mrs. Rondeau's call requesting the plaintiff to cancel. Mr. Rondeau indicated to Roger that the property had been placed in a real estate broker's hands and "it would be a different price if it had to go through a real estate broker."

On May 24 Rondeau received from Noel Lussier a check of $2,500, drawn by one Goodwin, as part payment of the farm. Goodwin requested Rondeau "to keep his name silent." On the following day

Rondeau consummated the sale of the farm. On June 7, 1966, the Rondeaus executed a deed of the real and personal property to the defendant's sons Roger and Noel Lussier. Two days later Roger conducted an auction of the personal property at the Rondeau farm. Mr. Rondeau widely reported that he received $65,000 from the sale to the Lussiers.

The defendant maintains that even if all this be admitted, the plaintiff's case would fail to establish liability on his part. The deficiency asserted is the lack of proof that the defendant ever communicated with his son concerning the purchase of the Rondeau farm. It is true that the record shows no actual direct communication between the defendant and his son on the subject. The evidence on the point is entirely circumstantial. But the circumstances are persuasive in the light of the financial interests and business structure in which the defendant operated.

In January 1961 the defendant and Noel Lussier joined in the formation of a corporation, known as A. Lussier & Sons, Inc., for the purpose of dealing in real estate, cattle and farm machinery. Later that year Noel caused to be recorded, with the town clerk at Hardwick, his sworn statement that he was doing business as a cattle dealer with the defendant, under the name of A. Lussier and Son, as provided in 11 V.S.A. §1621.

To be sure, it does not appear from the certified copy of the registration, marked as an exhibit in the case, that the defendant signed the statement of his partnership with Noel. His signature was not necessary to accomplish a valid certificate of registration, for the statute requires only the statement of one of the partners. 11 V.S.A. §1621, *supra*. Although the defendant denied this partnership, a sign was displayed at the farm where the Lussiers conducted their business, which was marked—"A. Lussier and Son,—Cattle & Real Estate."

The defendant frequently attended auctions conducted by his son Roger. At the auction, where he was contacted by the plaintiff about the Rondeau farm, he was seen leaving the premises in the company of Roger. From these facts a jury could find that he talked with Roger about the farm in accordance with his assurance to the plaintiff.

Relating this triangle of family business connections with the swift turn of events after the plaintiff's visit, the inference of communication is clear enough to take the question to the jury.

560

In granting the defendant's motion for verdict, the trial court prefaced its ruling by stating it was based on the evidence in the light most favorable to the plaintiff and "in view of the pleadings." The plaintiff construes this reference to the pleadings as the equivalent to granting the defendant's motion to dismiss the complaint for failure to state a cause of action. The court had previously denied the defendant's motion to this effect and then proceeded with the trial. On this state of the record, the order directing a verdict could not properly reverse a prior denial of a motion to dismiss the complaint and we do not so regard it.

■ All persons legitimately operating in the business community have a right to security against unlawful interference in their commercial dealings with others. The law's protection is not restricted to enforceable contracts. It extends with equal force to reasonable expectancy of profit. *Mitchell* v. *Aldrich,* 122 Vt. 19, 22, 163 A.2d 833.

■ The doctrine of the *Mitchell* case has appropriate application to brokerage agreements between real estate agents and their clients. It is founded on the broker's right to pursue his lawful occupation and safeguard the earnings of his industry. *Harris* v. *Perl,* 41 N.J. 455, 197 A.2d 359, 364; *Skene* v. *Carayanis,* 103 Conn. 708, 131 A. 497, 498. See also annotation 26 A.L.R.2d 1227. The reason is well explained in the *Harris* case, *supra,* in the opinion by Chief Justice Weintraub:

> "The economic facts and the expectations of fair men with respect to real estate brokerage are clear enough. The role of the broker is to bring buyer and seller together at terms agreeable to both, and both know the broker expects to earn a commission from the seller if he succeeds. The broker's stock in trade is his knowledge of what property is or can be made available and who is or can be interested in a given parcel. The inherent uniqueness of each parcel distinguishes the real estate broker from the salesman of automobiles or cutlery, for the very act of identifying real property or the prospective purchaser is itself both a rendition of a valuable service and an opportunity for a dishonest man to make off with the broker's stock in trade. In a practical world the broker must trust that those who seek or willingly accept his services will not cheat him of the fruit of his industry." 197 A.2d, *supra,* at 363.

That is not to say that the broker will be protected against disappointment from free and fair competition. Where as here, the property is not exclusively listed, it was implicit in the plaintiff's undertaking that he would accept competition from other brokers and from the seller himself. They, too, had equal interests to protect. If a dispute develops, the agent whose efforts procured the sale has a remedy against the owner. *Walbridge Agency, Inc.* v. *Rutland Hospital, Inc.*, 123 Vt. 149, 153, 186 A.2d 179.

In the absence of fraudulent conduct such a controversy is not the purchaser's concern. "But if the purchaser beats the broker out of his commission by buying from the owner directly or through a front, thus appropriating to himself the value of the services of the broker, he should pay for that mischief." *Harris* v. *Perl, supra,* 197 A.2d at 364.

It is not apparent on the present scene that the defendant was the immediate purchaser. However, his financial interests were identified with Noel and all were operating in the real estate market. It is of little consequence whether the defendant acted in his own, or their behalf.

The plaintiff's case composes the ingredients of fraud. For if, in fact, the defendant schemed the fictitious prospect from Stowe, to gain further information about the Rondeau offer, and thus decoy the plaintiff long enough to enable the purchasers to deal directly at the plaintiff's expense, liability is established. It is no defense, as the defendant suggests, that the purchasers had prior knowledge that the property was for sale. And it will not do to argue that the property would not sell at a price which included the broker's fee.

The question is whether the information which the plaintiff imparted, including the listing contract itself and the current prices for the bare and total farm, stimulated the interest which produced the sale. It is not whether the plaintiff closed the sale. The issue is whether a fraudulent scheme of the defendant prevented the plaintiff from performing his undertaking with the Rondeaus at the expense of his commission.

There is no legal right to deceptively invade the area of another's agreement. An outsider who does so for his own purposes may be held liable to the promisee who suffers from such interven-

tion. *Mitchell* v. *Aldrich, supra,* 122 Vt. at 25, 163 A.2d 833; *St. Johnsbury & Lake Champlain R. R. Co.* v. *Hunt,* 55 Vt. 570, 574; Harper and James, Law of Torts §6.9.

*The order directing a verdict of no liability was in error. Judgment reversed and cause remanded.*