NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 81

No. 2020-257

| | |
|---|---|
| Masiello Real Estate, Inc. | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Windham Unit, |
| | Civil Division |
| | |
| Michelle Matteo, Dow Williams, Michael Toore Nelson | January Term, 2021 |

Michael R. Kainen, J.

Jeremy S. Grant and Gary F. Franklin of Primmer Piper Eggleston & Cramer PC, Burlington, for
  Plaintiff-Appellant.

John C. Mabie of Windham Law, PLC, Brattleboro, for Defendant-Appellee Williams.


PRESENT:  Reiber, C.J., Robinson, Eaton and Cohen, JJ., and Howard, Supr. J. (Ret.),
                Specially Assigned


¶ 1.    **COHEN, J.**  Masiello Real Estate, Inc. appeals the superior court's conclusions of law on its breach-of-contract, quantum-meruit, and negligent-misrepresentation claims following a bench trial. Masiello's claims stem from seller Dow Williams' refusal to pay it a real estate commission under their right-to-market agreement. We affirm.

¶ 2.    The superior court made the following findings of fact based on evidence introduced at trial. Seller owned a 276-acre property in Halifax and Guilford, Vermont. In 2013, he executed a one-year, exclusive right-to-market agreement with Chris Long, a real estate broker who worked for Masiello. Seller and broker agreed on a $435,000 asking price and a fixed $25,000 broker commission. The agreement had a one-year "tail" that compelled seller to pay the

commission if, within twelve months of the agreement's expiration, seller sold the property and Masiello was the procuring cause. Broker listed the property on several real estate websites, including "Farm and Forest."

¶ 3.    During the contract term, broker showed the property to several potential buyers and received one offer below the asking price, which seller rejected. When the contract term expired in February 2014, seller and broker entered into a second listing agreement with the same provisions and a new one-year tail. Broker did not show the property during the term of the second agreement, which expired on January 1, 2015.

¶ 4.    In August 2015, Michelle Matteo and Torre Nelson, a Massachusetts couple interested in buying a Vermont property, reached out to broker. They sought to buy a property for a sum between $200,000 and $250,000. Broker showed Ms. Matteo and Mr. Nelson several other properties, none of which interested them. Mr. Nelson, recalling seeing the listing in Farm and Forest, inquired about seller's property. Broker contacted seller for a new listing agreement, and the two executed a third right-to-market agreement with a term of August 25 to September 30, 2015 and a one-year tail. Around this time, broker showed Ms. Matteo the property. However, the term of the third listing agreement expired, and no offer was made.

¶ 5.    In November 2015, broker sent a follow-up email to Ms. Matteo, who replied that she needed to sell her house in Massachusetts before she could move forward with a purchase in Vermont. A second exchange to the same effect occurred in February 2016.

¶ 6.    In June 2016, Ms. Matteo contacted broker, asking to walk the property again. Broker in turn emailed seller to obtain a new listing agreement. Seller declined, explaining that he and his wife were no longer motivated to sell but that broker could try for a deal under specified financing parameters. Seller added, "We will not sign a listing agreement but will honor you getting paid as a buyer broker, not a selling broker and will not engage them otherwise." Broker replied that he could not flip fiduciary duties and offered to proceed with negotiations to try to

2

obtain an offer of $435,000. Seller agreed to consider an offer for that sum but was clear that he was "not signing anything new except for a sales agreement as specified." Seller said, "We, in good faith, have told you we would accept an old offer." That month, Ms. Matteo visited the property alone and broker contacted her to determine her interest. The prospective buyers did not respond or make an offer at that time.

¶ 7. In August 2016, Ms. Matteo sent another Vermont realtor a list of properties she was interested in seeing. That same month, Mr. Nelson, having obtained seller's contact information from seller's neighbor, contacted seller directly and asked if he was still selling. Between August and September 2016, Mr. Nelson and seller discussed the fact that seller wanted $400,000 for the property and buyers wanted seller to consider a lower price. No offer was made at that time. The tail of the third right-to-market agreement expired on September 30, 2016. Between September and November of that year, Mr. Nelson and Ms. Matteo looked at other properties with the other realtor and made an unsuccessful offer on one of those other properties.

¶ 8. The prospective buyers renewed contact directly with seller in November 2016, with Mr. Nelson asking if the property was still available. Seller told Mr. Nelson that he wanted to net $425,000 on the sale. The parties negotiated until eventually seller sold the property to Ms. Matteo and Mr. Nelson on January 20, 2017.

¶ 9. Believing that it was improperly cut out of the sale, Masiello sued seller and buyers in the superior court under several theories, including breach of contract, quantum meruit, and negligent misrepresentation. After dismissing the claims against buyers, the court held a bench trial and issued a written decision rejecting Masiello's claims against seller. It concluded that because the property was not sold during the tail period, and because Masiello was not the procuring cause, no commission was due under the contract. The court further held that there was no negligent misrepresentation and that Masiello was not entitled to recovery under quantum meruit.

¶ 10.   On appeal, Masiello argues that it is owed a commission because it was the procuring cause of the sale and was prevented from completing the sale during the tail period because seller negotiated directly with buyers.  Masiello also maintains that seller breached the agreement by failing to direct Mr. Nelson's August 2016 inquiry to broker.  Relatedly, it argues that seller's failure to direct Mr. Nelson's inquiry to broker waived strict enforcement of the tail period.  Masiello further contends that broker's June 2016 email exchange with seller created an agency relationship that entitles Masiello to the commission under agency principles.  Finally, Masiello assigns error to the superior court's conclusions on the quantum-meruit and negligent-misrepresentation claims.

¶ 11.   Masiello does not challenge the superior court's findings of fact, but its conclusions of law.  Our review of these is plenary and nondeferential.  Okemo Mountain, Inc. v. Lysobey, 2005 VT 55, ¶ 13, 178 Vt. 608, 883 A.2d 757 (mem.).  "We uphold trial court conclusions if they are supported by findings that are, in turn, supported by the evidence."  Id.

I.  Breach of Contract

¶ 12.   We first consider Masiello's breach-of-contract arguments.  The relevant language of the tail provision is as follows:

> [Seller] also agrees to pay the full commission due under this Agreement if, within 12 month(s) after the Expiration Date or earlier termination of this Agreement, [seller] directly or indirectly enters into a purchase and sale contract, sells, exchanges or closes on the sale or exchange of the Property and [Masiello] is the procuring cause thereof.  For purposes of this Agreement, [Masiello] will be regarded as the procuring cause of any such agreement, sale, exchange or closing if its efforts are the foundation upon which the negotiations are begun that result in a purchase and sale contract, sale, exchange or closing.

¶ 13.   "Our goal when interpreting contractual provisions is to give effect to the intent of the parties as it is expressed in their writing."  Southwick v. City of Rutland, 2011 VT 105, ¶ 5,

190 Vt. 324, 30 A.3d 1298. When the language of the contract is unambiguous, we take the plain meaning of the words the parties used to represent their intent. Id.

¶ 14. Under the plain language of this contract, to be entitled to the commission, the sale must have been effected within twelve months of the expiration of the agreement "and" Masiello must have been the procuring cause of the sale. Masiello argues at length that it should receive the commission even though the sale took place after the tail period, including its argument that seller waived the tail period. We conclude that Masiello was not the procuring cause of the sale within the tail period. Following the parties' arguments in the superior court and before this Court, we read the words "procuring cause" in the contract in light of our settled law governing the payment of real estate commissions.[1]

¶ 15. "Under Vermont law, to be entitled to a commission, a broker must show that he [or she] procured a purchaser ready, willing, and able to purchase at the price and upon the terms prescribed by the seller." Osler v. Landis, 138 Vt. 353, 356, 415 A.2d 1316, 1318 (1980). To shoulder this burden, the broker "must show more than incidental relationship to the resulting sale"—he must "show that his efforts dominated the transaction." Gilmer v. Fauteux, 168 Vt. 636, 638, 723 A.2d 1150, 1152 (1998) (mem.) (quotations omitted).

¶ 16. In Gilmer, for example, the broker called the buyer (Cersosimo) on the phone four times about the property over the course of years, but the buyer did not make an offer. Then, as

---

[1] We do not understand Masiello to argue that by adding the sentence referencing "the foundation upon which the negotiations are begun that result in a purchase and sale contract," the parties intended to create a different standard than our settled law on the subject. Indeed, Masiello bases its arguments on our law applying the procuring-cause doctrine. To the extent Masiello tried to present that argument with one sentence in its brief referencing the "foundation" language, the record does not show that such an argument was raised before the superior court, rendering it unpreserved for appeal, and we in any event consider it inadequately briefed. See Progressive Ins. Co. v. Brown, 2008 VT 103, ¶ 6, 184 Vt. 388, 966 A.2d 666 ("[I]n order to rely upon an argument on appeal, an appellant must properly preserve it by presenting it to the trial court with specificity and clarity." (quotation omitted)); see also Alpine Haven Prop. Owners' Ass'n v. Deptula, 2020 VT 88, ¶ 21 n.3, ___Vt. ___, 245 A.3d 1245 ("We consider only those arguments that are adequately briefed.").

the broker was negotiating with two other potential buyers, the owner sold the property directly to Cersosimo. This Court held that the broker did not procure the sale, observing that "[e]ven assuming that [broker] first interested Cersosimo in the property, that fact is not enough to demonstrate that he procured the sale." Id.; see also M.E. Walbridge Agency, Inc. v. Rutland Hosp. Inc., 123 Vt. 149, 154, 186 A.2d 179, 183 (1962) ("Although the broker's efforts need not be the sole cause of the sale, it is essential that they dominate the transaction and amount to something more than an incidental or contributing influence.").

¶ 17. A different result obtained in Ellis-Gould Corp. v. Kelly, 134 Vt. 255, 356 A.2d 497 (1976). There, a broker negotiated with a buyer and arranged several meetings between his brokerage firm's attorney and the buyer relating to zoning regulations and financing. Learning, however, of an imminent offer from another, and in view of the broker's leave on vacation, the buyer contacted the seller directly and bought the property. We held that, notwithstanding the broker's absence at the last minute, the broker procured the sale and therefore earned his commission. Id. at 257, 356 A.2d at 499.

¶ 18. Under the undisputed facts presented in this case, broker was not the procuring cause of the sale. Broker indeed placed the original advertisement in Farm and Forest, which first drew buyers to the property. Broker also showed the property to Ms. Matteo between August and September 2015. But broker was unable to deliver an offer at that time. Then, between November 2015 and February 2016, broker sent follow-up emails to Ms. Matteo, but buyers were not able to make an offer because they had to sell their Massachusetts house. Broker again engaged buyers and seller when, in June 2016, Ms. Matteo renewed contact with broker. Broker emailed Ms. Matteo after she visited the property alone, but again broker was unable to deliver an offer following this wave of negotiations. Even the direct negotiations between seller and buyers between August and September 2016 did not result in an offer. Buyers were not ready to accept the $400,000 asking price and asked seller to consider a lower price. Additionally, between

6

September and November of that year, Mr. Nelson and Ms. Matteo were actively engaged with another broker and looking at other properties, going so far as making an unsuccessful offer on one of those other properties. It was not until a further wave of negotiations starting in November 2016 that the property was ultimately sold in January 2017.

¶ 19. The successful November 2016 wave of negotiations came after successive breaks in negotiations. They came after buyers had disengaged not only broker but even seller for months and pursued other properties. Before the last wave of negotiations, buyers were not prepared to proceed given the need to sell their Massachusetts home and given the $400,000 asking price on the property. We cannot say under these facts that broker "procured a purchaser ready, willing, and able to purchase at the price and upon the terms prescribed by the seller" within the tail period or that "his efforts dominated the transaction." Gilmer, 168 Vt. at 638, 723 A.2d at 1151-52 (quotations omitted).

¶ 20. We next consider whether seller breached the contract when he did not direct to broker the buyers' inquiry in August 2016. The contract provides that seller "agrees to direct all inquiries concerning this Property from whatever source to [Masiello] during the period of this Agreement" and that "[a]ny failure to do so shall constitute a substantial breach of this agreement." Masiello argues that the phrase "period of this Agreement" refers to not just August 25 to September 30, 2015, but also the one-year tail extending until September 30, 2016. Masiello observes that the contract establishes the "Term of Agreement" as August 25 to September 30, 2015, and therefore the "period of this Agreement" must mean something different and include the one-year tail period. We disagree.

¶ 21. There is nothing to suggest that "period" should be read differently than "term" in the agreement. "Term" means "a limited or definite extent of time" and "the time for which something lasts." Term, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/term [https://perma.cc/D9TR-8NGN]. "Period" similarly means "a

7

chronological division." Period, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/period [https://perma.cc/VF7K-RFYN]. The dictionary further explains that "period" can mean "a division of time" and "may designate an extent of time of any length." Id. One can readily reference the "term" and "period" of a contract interchangeably. In this context, the word "period" is synonymous with "term."

¶ 22. Any doubt is eliminated when we consider that to define the "period" of the agreement to include the tail would mean that seller would have had simultaneous obligations to multiple brokers if he had chosen to engage a different broker after the contract term, something he was free to do. It is unlikely that the parties intended such an anomalous result. A harmonious reading of both the redirect-inquiries and tail provisions of the contract recognizes that the tail was intended to compensate broker for his actions during the contract period in procuring a sale that arises after the term of the contract, not that seller was barred from engaging other brokers or buyers after the contract term. See Trs. of Net Realty Holding Tr. v. AVCO Fin. Servs. of Barre, Inc., 147 Vt. 472, 476, 520 A.2d 981, 983 (1986) (observing that this Court favors interpretation that makes contract fair and reasonable). The record is clear that the first direct email from buyers to seller was in August 2016—outside the term of the agreement. Accordingly, under the terms of this contract, seller had no obligation to direct the inquiry to broker. Given this, we reject Masiello's related assertion that seller prevented it from performing under the agreement by directly negotiating with sellers during the tail period. Its assertion that seller "waived" the tail period in a June 2016 email exchange is equally uncompelling. As the court explained, while this might be a reasonable argument if broker continued to work to accomplish a sale going beyond the tail date, broker did nothing after June 29, 2016, three months before the tail date expired.

¶ 23. In sum, seller did not breach the contract by declining to pay Masiello the commission because the contract condition so binding him was not satisfied and seller was under no obligation to direct the buyers' inquiry to broker outside the term of the contract.

8

## II. Agency

¶ 24.    Masiello next argues that in a June 2016 email, seller created an agency relationship with it by "direct[ing] Masiello, his agent, to continue to work to try to sell the Property to his prospects, the Buyers." Relying on this premise, Masiello contends that, when buyers approached seller directly in August 2016, seller knew or should have known that "the appearance of a customer" for the property was due to his agent Masiello's efforts. Masiello cites Restatement (Second) of Agency § 448 cmt. f (1958) in support of its position. According to Masiello, because seller did not ask broker if he caused the buyers to appear, seller must pay it the agreed-upon commission.

¶ 25.    Masiello's argument rests on a faulty premise. We concluded above that seller had no contractual obligation to direct buyers' inquiry to broker during the tail period. See supra, ¶ 23. The trial court rejected Masiello's argument that the June 2016 email exchange, which occurred during the tail period, created a new agency relationship between seller and Masiello, and its conclusion is supported by the findings and the record. The court explained that in early June 2016, buyers contacted broker about the property because they were about to sell their Massachusetts home. Broker then contacted seller to see if he was still interested in selling, whether he would take back paper, and whether Ms. Matteo could walk the property again. Seller responded affirmatively to these questions. When broker asked seller for a new listing agreement, seller responded that he would "not sign a listing agreement but will honor you getting paid as a buyer broker and will not engage them otherwise."

¶ 26.    Taken in its proper context, the court determined that seller meant he would not give broker another listing agreement and that broker could act as a buyer broker but otherwise seller was not going to further engage. The court credited seller's testimony that he found broker's "realtor hype" tiresome and did not want to use him as an agent. It found seller's testimony on the subject consistent with the facts and circumstances. It noted that, at the time of this exchange, the

9

parties were still in the one-year tail period and thus, if buyers bought the property in that time frame, broker would receive a commission. In reaching its conclusion, the court emphasized the preference for written listing agreements under Vermont law. See McDonald v. Roderick, 158 Vt. 1, 5-6, 603 A.2d 369, 372 (1992) (observing that when listing agreement is oral, recovery of real estate commission will always be barred because requirement of written agreement ensures that parties are fully aware of terms of agreement); see also Gilmer, 168 Vt. at 637, 723 A.2d at 1151 (citing McDonald and recognizing "rule require[es] an executed written agreement, which is aimed at ensuring that the parties are fully aware of the terms of the agreement," but finding it unnecessary to decide if rule applied). For the reasons above, it rejected Masiello's argument that, through this email, seller made broker his agent.

¶ 27. Masiello offers no compelling argument to the contrary. It appears to simply war with the trial court's assessment of the evidence. "We reiterate that as the trier of fact, it is the province of the trial court to determine the credibility of the witnesses and weigh the persuasiveness of the evidence." Lanfear v. Ruggerio, 2020 VT 84, ¶ 27, __ Vt. __, 254 A.3d 168 (quotation omitted) (alterations omitted). The record does not show seller "expressly authorized Masiello, as his agent, to continue to work to try to sell the Property to the Buyers." Seller did not "direct" broker to do anything and seller expressly disavowed an agency relationship, a disavowal credited by the trial court. Given the absence of the agency relationship urged by Masiello, the language from the Restatement (Second) of Agency does not apply and seller had no obligation under an agency theory to contact broker when approached directly by the buyers in August 2016.

### III. Quantum Meruit

¶ 28. Masiello next argues that the trial court erred in concluding that because "a contract governed the parties' relationship," it could not prevail on its quantum meruit claim. It maintains that its agreement with seller did not address the services that form the basis of its quantum meruit claim. According to Masiello, after the listing agreement expired, seller expressly authorized it

10

"to show, market and negotiate with a single prospect," seller said he would not otherwise engage the prospective buyers, Masiello relied upon these representations, and seller then excluded it and negotiated the sale directly with Masiello's prospect. Masiello asserts that it would be inequitable for seller to avoid compensation because Masiello's failure to complete the sale became impossible once seller started to negotiate directly with buyers.

¶ 29. We find no error. First, to the extent that Masiello relied below on actions it took during the contract term, which does not include the tail period, the trial court properly concluded that Masiello could not recover on a quantum-meruit theory. As the trial court explained, "[t]he right to recover in quantum meruit does not grow out of contractual obligations established by mutual agreement, but is independent of any contract, or lack thereof, and is based upon the promise implied by law to make fair compensation for beneficial services rendered and knowingly accepted." (quoting Crawford v. Farrington, 2011 WL 7945810 (Vt. Super. Ct. Mar 2, 2011) (emphasis omitted)). See, e.g., Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 516 N.E.2d 190, 193 (N.Y. 1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.").

¶ 30. Masiello fails to show that it is entitled to recover under this theory for actions taken outside the contract period. "In order to prevail on a quasi-contract claim, . . . plaintiff must prove that (1) a benefit was conferred on defendant; (2) defendant accepted the benefit; and (3) defendant retained the benefit under such circumstances that it would be inequitable for defendant not to compensate plaintiff for its value." Center v. Mad River Corp., 151 Vt. 408, 412, 561 A.2d 90, 93 (1989); see also DJ Painting, Inc. v. Baraw Enters., Inc., 172 Vt. 239, 242, 776 A.2d 413, 417 (2001) ("Claims for quasi-contract are based on an implied promise to pay when a party receives a benefit and the retention of the benefit would be inequitable."); Clark-Fitzpatrick, Inc., 516 N.E.2d at 193 ("A 'quasi contract' only applies in the absence of an express agreement, and is not

11

really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment.").

¶ 31. The record here does not support the factual assertions raised by Masiello in support of its claim. The court did not find that seller expressly authorized Masiello "to show, market and negotiate with a single prospect." To the contrary, it found that seller did not direct Masiello to do anything after the expiration of the contract term and that seller did not want to use broker as an agent. The court similarly did not find that seller promised not to engage these buyers. Instead, it found that seller had no obligation to refer buyers back to broker when buyers directly contacted him. The court found that seller no longer wanted to engage with broker and informed him so. The facts here show no benefit conferred or accepted and no inequitable result. The elements of quantum-meruit were not satisfied. See Center,151 Vt. at 413, 561 A.2d at 94 (holding that there can be no recovery under quasi-contract theory when there is no inequity).

IV. Negligent Misrepresentation

¶ 32. Finally, Masiello contends that seller engaged in negligent misrepresentation in his June 2016 email, where he stated, "[w]e will not sign a listing agreement but will honor you getting paid as a buyer broker, not a selling broker and will not engage them otherwise." Masiello argues that despite a representation that he would not engage the buyers, seller did so when buyers contacted him directly.

¶ 33. This Court has adopted the definition of negligent misrepresentation in the Restatement (Second) of Torts, which provides:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

12

Limoge v. People's Tr. Co., 168 Vt. 265, 269, 719 A.2d 888, 890 (1998) (quoting Restatement (Second) of Torts § 552(1) (1977)).

¶ 34.    There was no misrepresentation here.  There is a difference between breaking a promise and misrepresenting a fact.  At most, seller here broke a promise that he would not negotiate with buyers directly.  His statement was neither true nor false at the time it was said. Seller did not supply false information.  If seller's words expose him to liability, it is not under a negligent-misrepresentation theory.[2]

Affirmed.

FOR THE COURT:

_____

Associate Justice

---

[2] Because we resolve Masiello's argument on this basis, we need not consider whether the claim is barred by the economic-loss rule, under which "claimants cannot seek, through tort law, to alleviate losses incurred pursuant to a contract."  Springfield Hydroelectric Co. v. Copp, 172 Vt. 311, 314, 779 A.2d 67, 70 (2001).

13