NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2023 VT 35

No. 22-AP-086

| | |
|---|---|
| Gregg Beldock | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, Civil Division |
| | |
| VWSD, LLC et al. | September Term, 2022 |

Samuel Hoar, Jr., J.

Erin Miller Heins of Langrock Sperry & Wool, LLP, Burlington, for Plaintiff-Appellant.

Heather E. Ross and Peter G. Raymond of Sheehey Furlong & Behm P.C., Burlington, for Defendants-Appellees.

PRESENT: Reiber, C.J., Eaton, Carroll, Cohen and Waples, JJ.

¶ 1. **EATON, J.** The present case involves the deterioration of a contractual relationship. Plaintiff Gregg Beldock contracted to purchase four solar assets in development from VWSD, LLC. Following allegations of breach, VWSD sold three of the solar assets to a third party, Green Lantern. Beldock filed a complaint against VWSD alleging breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment, and against Green Lantern and its president alleging tortious interference with contract and unjust enrichment. VWSD counterclaimed for breach of contract. The trial court granted summary judgment in favor of all three defendants on Beldock's claims and in part in favor of VWSD on its counterclaim. We agree with the trial court's grant of summary judgment regarding all claims against Green Lantern

and its president and the implied-covenant claim against VWSD. However, because portions of the contract are ambiguous and a genuine dispute of material facts remains, we conclude that summary judgment was inappropriate for Beldock's breach-of-contract and unjust-enrichment claims against VWSD and VWSD's counterclaim for breach of contract. We reverse and remand.

## I. Factual Background

¶ 2. The following material facts are undisputed unless otherwise noted. Beldock is a developer of solar projects in Vermont. VWSD, LLC is a Vermont company, owned and operated by Victor and William Veve, that also develops solar projects. In late 2015 or early 2016, the Veves began communicating with Beldock about his interest in purchasing some of VWSD's in-development solar projects. On January 18, 2016, the Veves, on behalf of VWSD, and Beldock entered into a contract for the sale of four of VWSD's solar assets to Beldock or one of his business entities.

¶ 3. The contract states that it is for "the individual sales of certain assets owned by VWSD" to Beldock. It then lists four assets, identified by location: (1) North Troy; (2) North Hyde Park; (3) Alburgh Missile Base; and (4) Milton. Under the heading for each individual asset, the contract lists certain terms specific to the asset, including development and other fees to be paid by Beldock to VWSD upon certain occurrences. For each project, the development fee was due "upon delivery" to Beldock of certain listed documents. For North Troy, the development fee was due "upon delivery" of the Certificate of Public Good (CPG), and an additional fee was due "upon delivery of [a] satisfactorily executed off-taker agreement which form is attached hereto."[1] For North Hyde Park, Alburgh Missile Base, and Milton, the development fee was due "upon delivery" of the CPG and a "satisfactorily executed off-taker agreement which form is attached

---

[1] An off-taker is "the entity (often a large private business, a municipality, or educational institution) that contracts with the renewable energy project owner to purchase the power from the net metering project."

2

hereto." The clauses regarding the off-taker agreements also each provide, "[Beldock] shall have the right to disapprove of the off-taker based upon the reasonable financial viability and credit worthiness of the off-taker." Following the description of the fees for each asset, the contract contains general provisions. It states that Beldock must pay an additional fee for costs upon delivery of a certain quantity of "reasonably acceptable executed off-taker agreements." The "sale of each" asset is " 'as is' upon the satisfactory delivery of each element" described in the contract. Lastly, the contract provides that "[i]n the event that there is a failure to pay [VWSD] by [Beldock] for any of the agreed upon sums of money included in the terms . . . [VWSD] shall retain the right to remarket the assets with no further obligation to [Beldock]."

¶ 4. It is undisputed that no off-taker-agreement form was physically attached to the contract; however, the parties dispute whether a form was ever provided and if it was, when that occurred. Beldock testified that he provided a form off-taker agreement for the assets to VWSD when the agreement was signed. He also maintains that VWSD never used the form he provided to them. VWSD asserts that Beldock sometime later provided an off-taker-agreement form in connection with the North Troy project, and that it used the form provided for its off-taker agreements for North Hyde Park and Alburgh Missile Base.

¶ 5. In addition to the written contract described above, Beldock asserts that VWSD agreed to provide proof of site control for each project before Beldock would need to pay the fees; however, VWSD denies this.

¶ 6. On January 18, 2016, VWSD delivered Beldock the CPG for North Troy, and Beldock paid the associated fees on or about February 2. Sometime in the spring of that same year, VWSD delivered the North Troy off-taker agreement and land-control documents, and Beldock paid the fees associated with those deliverables. The parties dispute whether issues surrounding site work and title were addressed between delivery of the CPG and payment. The parties also dispute whether, between January and September 2016, Beldock provided VWSD with

3

"assistance," not required under the written contract, in obtaining the deliverables for the remaining three projects.

¶ 7. In March 2016, VWSD received the CPGs for North Hyde Park and Alburgh Missile Base. Beldock reviewed these CPGs in spring and early summer 2016. On August 31, VWSD delivered the following documents to Beldock for Alburgh Missile Base: the CPG, off-taker agreements, and land-control documents. On September 14, VWSD delivered the following documents to Beldock for North Hyde Park: the CPG, an option to purchase, and an off-taker agreement. VWSD's option to purchase for North Hyde Park was due to expire the next day or soon thereafter. VWSD obtained extensions of the option to purchase, delivering them to Beldock on October 11 at the latest. The parties dispute whether the form and substance of the off-taker agreements for these two projects matched the form Beldock claims he provided to VWSD.

¶ 8. Between August 31 and September 14, VWSD repeatedly inquired about payment for Alburgh Missile Base. On September 13, Beldock proposed payment for that project in three installments. The parties dispute whether this was a proposed contract modification because the fees were already due or whether this was an offer to provide an advance although no money was due yet under the contract. Either way, VWSD rejected the proposal.

¶ 9. On September 16, Beldock emailed VWSD stating that he was "[h]appy to close in [thirty] days," quickly following up by specifying, "[i]f all of the documents and permits are in line and acceptable, we will close in [thirty] days." Then, on October 20, Beldock emailed VWSD to inform it that he would not be purchasing Alburgh Missile Base. The parties dispute Beldock's reason for rejecting the asset—whether it was due to concerns about financial viability and creditworthiness of the off-takers or the form of the off-taker agreements. In the email, Beldock provided four reasons for the rejection: (1) hazardous-waste conditions rendering the project unduly onerous to insure; (2) busy scheduling making it hard to "fit" this project in; (3) difficulty conforming to the "invasive species requisite [sic]"; and (4) that the "off-taker agreements in both

4

form and context do not meet [his] requirements or those of the major utilities [he] [does] business with in the normal course of business."

¶ 10.    In that same email, Beldock indicated that he had received the extension for the option to purchase North Hyde Park and stated that he was willing to close in the next week subject to VWSD providing him with three specified deliverables by October 23.  The parties dispute whether VWSD was under any obligation to provide these three deliverables to Beldock.

¶ 11.    On October 27, VWSD gave notice to Beldock that it was terminating the agreement because Beldock had breached the contract by failing to pay for North Hyde Park and Alburgh Missile Base.  Beldock responded that VWSD was still bound by the contract.

¶ 12.    Since the fall of 2015, VWSD had been in talks with Luke Shullenberger, founder and president of Green Lantern, a Vermont company.  They discussed the sale of some of VWSD's projects to Green Lantern; however, no specifics were agreed upon.  In August 2016, after the contract between Beldock and VWSD was executed, Shullenberger emailed the Veves to invite them to discuss business, stating therein that he was confident he was "a better option than Beldock for getting [the projects] financed and built."  The parties dispute whether Shullenberger was attempting to convince VWSD to sell North Hyde Park, Alburgh Missile Base, and Milton to Green Lantern instead of to Beldock.  According to Beldock, Shullenberger purposefully induced VWSD to breach its contract with Beldock because he knew about the agreement and offered a better deal.  However, defendants state that Shullenberger's email was sent as a follow-up to conversations from months prior and before he knew of the specific contract with Beldock.  In fact, they assert that Shullenberger and Green Lantern encouraged VWSD to complete its contract with Beldock.

¶ 13.    In the course of negotiations, VWSD and Green Lantern exchanged various drafts of term sheets.  This culminated in a nonbinding term sheet executed on September 22, 2016, which does not require VWSD to sell any assets to Green Lantern.  The term sheet includes the

Alburgh Missile Base, North Hyde Park, and Milton projects, among others. It also contains a clause titled "Current Contracts," which states, "It is expressly understood that these projects are currently under contract and are not to be included until valid termination of contract has been received which is expected in the next [thirty] days from the signing of this agreement." This term sheet also contains a confidentiality clause and an exclusivity clause. Some earlier drafts of the nonbinding term sheet did not contain explicit carveouts for the Beldock assets.

¶ 14. It is undisputed that the payment price for these three assets was different in the Green Lantern term sheet than the Beldock contract. However, the parties disagree about whether these differences rendered the Green Lantern term sheet more lucrative for VWSD.

¶ 15. On October 28, one day after VWSD notified Beldock of the termination of their contract, VWSD and Green Lantern entered into a master asset purchase agreement (MAPA). Like the nonbinding term sheet, the MAPA contained a carveout for North Hyde Park, Alburgh Missile Base, and Milton, acknowledging that they were part of an agreement with Beldock and could be subject to litigation that could preclude their sale to Green Lantern.

¶ 16. Beldock did not pay VWSD for Alburgh Missile Base or North Hyde Park. VWSD did not provide Beldock with the Milton deliverables. On December 12, 2016, VWSD closed on its sale of Alburgh Missile Base, North Hyde Park, and Milton to Green Lantern.

## II. Procedural History

¶ 17. On November 23, 2016, Beldock filed a complaint against VWSD in the civil division alleging breach of contract, breach of the implied covenant of good faith and fair dealing, and equitable estoppel. He subsequently amended his complaint three times to add the following: Shullenberger and Green Lantern as defendants to the equitable-estoppel claim, a tortious-interference-with-contract claim against Shullenberger and Green Lantern,[2] and an unjust-

---

[2] The complaint calls this claim "tortious interference with business relations." The basis of this claim is interference with a contract and the parties and trial court cite to sources discussing

6

enrichment claim against VWSD, Shullenberger, and Green Lantern. As a remedy, Beldock sought to prevent VWSD from selling North Hyde Park and Milton to Green Lantern, as well as attorney's fees and other relief as necessary.[3] VWSD filed an answer and counterclaims, alleging breach of contract and breach of the implied covenant of good faith and fair dealing.[4] VWSD also requested compensatory and consequential damages and attorney's fees.

¶ 18. In July 2020, all three defendants jointly moved for summary judgment on all five of Beldock's claims against them. In response, Beldock filed an opposition to defendants' motion for summary judgment and cross-moved for summary judgment on all of his claims and on VWSD's counterclaims. VWSD then filed a cross-motion for summary judgment in its favor on its counterclaim for breach of contract. With these motions, the parties each submitted various statements of undisputed facts and responses to each other's statements of undisputed material facts, identifying various points of dispute with reference to evidence in the record.

¶ 19. The trial court ruled on all pending summary-judgment motions in a single order. First, it identified facts that it deemed material and undisputed for purposes of the summary-

interference with a contract; we accordingly treat the claim as tortious interference with contract. See Gulf Coast Hospice LLC v. LHC Grp. Inc., 17-CA-01634-SCT, ¶ 87, 273 So. 3d 721 (Miss. 2019) (explaining that tortious interference with contract differs from tortious interference with business relations).

[3] Beldock continues to have no interest in closing on Alburgh Missile Base.

[4] VWSD also requested a declaratory judgment that it properly terminated the contract and was free to remarket the assets; however, the trial court dismissed this claim on the ground that VWSD had already sold the assets. In the summary-judgment order, the trial court stated that Beldock was seeking summary judgment on VWSD's declaratory-judgment claim, denied summary judgment as to this claim, and indicated that it remained for further disposition but would not require trial. However, in Beldock's motion for summary judgment, he states that the trial court previously dismissed the claim for declaratory judgment. Because VWSD's declaratory-judgment claim had already been dismissed, summary judgment could not have been denied as to it. The claim requires no further disposition.

judgment motion and any subsequent trial pursuant to Vermont Rule of Civil Procedure 56(g).[5] It granted summary judgment in favor of all three defendants on all of Beldock's claims and partial judgment on VWSD's counterclaim for breach of contract.[6] VWSD's other counterclaims remained for trial. Pursuant to Vermont Rule of Civil Procedure 54(b), Beldock filed an unopposed motion for partial final judgment on the claims for which summary judgment was entered. The trial court entered partial final judgment, and Beldock appealed to this Court.

¶ 20. Beldock argues that the trial court erred when it granted summary judgment in favor of defendants on his claims for breach of contract, good faith and fair dealing, tortious interference, and unjust enrichment and in favor of VWSD on its breach-of-contract counterclaim.[7] He argues

---

[5] Defendants argue that, because Beldock did not explicitly appeal this Rule 56(g) determination, the trial court's findings will apply at trial regardless of the outcome of this appeal. Under Rule 56(g), the trial court "may enter an order stating any material fact . . . that is not genuinely in dispute and treating the fact as established in the case." Accordingly, Rule 56(g) determinations are reviewed for an abuse of discretion, not clear error. Kreg Therapeutics, Inc. v. VitalGo, Inc., 919 F.3d 405, 415 (7th Cir. 2019). The purpose of this rule is to permit the trial court to "salvage some results from the time and resources spent in deciding unsuccessful summary-judgment motions." Id. (quotation omitted). As part of his appeal, Beldock has clearly argued that material facts were in dispute, foreclosing a proper grant of summary judgment on certain issues. To the extent we identify disputed material facts in our Rule 56(a) analysis that contravene the trial court's designation of undisputed facts for purposes of trial under Rule 56(g), those findings cannot stand.

[6] The trial court stated that Beldock's claims were "dismissed with prejudice." We note that it is not entirely accurate to call a grant of summary judgment in favor of a defendant a dismissal. See generally B.S. Shannon, A Summary Judgment Is Not a Dismissal!, 56 Drake L. Rev. 1 (2007) (contrasting dismissal and summary judgment, and imploring against conflation to avoid inaccuracy and confusion). For consistency and clarity, the better practice to reflect the procedural posture of the court's disposition would be to refer to it as a judgment. See, e.g., Self v. I Have A Dream Found.-Colorado, 552 F. App'x 782, 783 (10th Cir. 2013) (involving confusion between whether trial court dismissed action or granted summary judgment); cf. Blakely v. Wards, 738 F.3d 607, 611 (4th Cir. 2013) (en banc) (interpreting word "dismissal" in statute to include summary judgment where legislature did not intend to differentiate based on procedural posture); but see id. at 623-34 (Duncan, J., concurring) (imploring that "dismissal is a term of art with a specific legal provenance"); id. at 625-26 (Motz, J., dissenting) (emphasizing differences between dismissal and summary judgment).

[7] Although Beldock occasionally references his "equitable claims" generally in his briefs, he does not actually raise any arguments regarding equitable estoppel on appeal. Any challenge to the trial court's entry of summary judgment in favor of defendants on Beldock's equitable

that the trial court reached various incorrect legal conclusions and that there were also material facts in dispute that precluded a grant of summary judgment on all these claims.

¶ 21. "We review a grant of summary judgment de novo, using the same standard as the superior court." Tillson v. Lane, 2015 VT 121, ¶ 7, 200 Vt. 534, 133 A.3d 832. "Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Bartlett v. Roberts, 2020 VT 24, ¶ 9, 212 Vt. 50, 231 A.3d 171 (citing V.R.C.P. 56(a)). "In determining whether a dispute over material facts exists, we accept as true allegations made in opposition to the motion for summary judgment, so long as they are supported by affidavits or other evidentiary material." White v. Quechee Lakes Landowners' Ass'n, 170 Vt. 25, 28, 742 A.2d 734, 736 (1999). The nonmoving party is "entitled to the benefit of all reasonable doubts and inferences." Lawson v. Halpern-Reiss, 2019 VT 38, ¶ 21, 210 Vt. 224, 212 A.3d 1213 (quotation omitted).

¶ 22. First, we begin with the parties' breach-of-contract claims. Upon review of the written agreement, we conclude that various portions of the contract are ambiguous and material facts remain disputed. Therefore, summary judgment was inappropriate for both parties' breach-of-contract claims. Second, we address Beldock's good-faith-and-fair-dealing claim and conclude that summary judgment in favor of VWSD was appropriate because his claim failed as a matter of law and none of the disputed facts would change this outcome. Third, on the claim against Green Lantern and Shullenberger for tortious interference with contract, we again determine that summary judgment was appropriate because, as a matter of law, Green Lantern and Shullenberger did not improperly interfere with Beldock's contract with VWSD. Fourth, regarding unjust enrichment, we conclude that the trial court properly granted summary judgment in favor of Green

---

estoppel claim is therefore waived. See Havill v. Woodstock Soapstone Co., 2007 VT 17, ¶ 10, 181 Vt. 577, 924 A.2d 6 (stating issues not raised on appeal are waived for review).

Lantern and Shullenberger but that material facts precluded a grant of summary judgment in favor of VWSD. We therefore reverse and remand for further proceedings on the issues remaining.

### III. Breach of Contract

¶ 23. The focal point of this dispute is the contract. The parties disagree vehemently about various aspects of its operation. In Beldock's complaint, he alleged that VWSD breached the contract by failing to provide required deliverables, failing to sell him North Hyde Park and Milton, and by offering to sell North Hyde Park and Milton to Green Lantern while those assets were still under contract for sale to Beldock. VWSD, in its counterclaim, states that Beldock breached the contract by failing to make required payments for North Hyde Park and Alburgh Missile Base.

¶ 24. The trial court granted summary judgment in favor of VWSD in whole on Beldock's claim and in part on VWSD's counterclaim, concluding that Beldock had breached the contract but allowing the issue of damages to continue to trial. Starting with Beldock's claim, it concluded that the form of the off-taker agreements was immaterial under the contract and that any failure on VWSD's part to use the "correct" forms was not a breach. With regard to payment, it concluded that Beldock was obliged to pay when VWSD tendered each deliverable and that he undisputedly failed to do so for North Hyde Park and Alburgh Missile Base thereby breaching the contract. The court also concluded that, even assuming the contract permitted a reasonable delay between delivery and payment, VWSD was still justified in declaring him in breach because over a month had passed following delivery and he did not use that time to conduct due diligence. Relying on the plain language of the contract, the trial court determined that Beldock's failure to pay for the North Hyde Park and Alburgh Missile Base deliverables discharged VWSD's duty to sell him Milton, because the contract was not divisible and accordingly his material breach allowed VWSD to "walk away from the entire deal."

¶ 25. Turning to VWSD's breach counterclaim, the trial court determined that VWSD did not breach the contract when it engaged in negotiations with Shullenberger and entered the nonbinding term sheet with the asset-carveout provision. Relying on its conclusions as to Beldock's claims, it decided that Beldock therefore breached the contract when he failed to pay for North Hyde Park and asked for additional deliverables. However, it concluded that material facts were in dispute as to whether payment was due yet for Alburgh Missile Base because Beldock made a sufficient showing that a question of fact existed as to whether he rejected the off-taker for a permissible reason.[8] Lastly, it concluded that VWSD's damages as a result of Beldock's breach could not be resolved on summary judgment.

¶ 26. There are two separate breach-of-contract claims, and the issues of contract interpretation within them are intertwined and the arguments raised overlap. Accordingly, we endeavor to construe the contract, addressing all issues implicated in this appeal, to the extent we can on the record before us. Then, we explain the impact of this analysis on the parties' respective claims for purposes of their motions for summary judgment.

¶ 27. Whether a set of facts constitutes a breach of contract is a question of law. Hootselle v. Mo. Dep't of Corr., 624 S.W.3d 123, 135 (Mo. 2021) (en banc). "[T]he cardinal rule in construing contracts is the intent of the parties." Sullivan v. Lochearn, Inc., 143 Vt. 150, 152, 464 A.2d 745, 746 (1983). "To determine the meaning of a specific provision of a contract, we consider the whole instrument and construe it in harmony if possible." John A. Russell Corp. v. Bohlig, 170 Vt. 12, 17, 739 A.2d 1212, 1216-17 (1999). When the plain language of a contract is clear, the contract is unambiguous and the plain language controls as a matter of law. Southwick v. City of Rutland, 2011 VT 105, ¶ 5, 190 Vt. 324, 30 A.3d 1298.

---

[8] Any apparent inconsistency between the trial court's conclusions regarding whether Beldock breached as to Alburgh Missile Base is immaterial in light of our conclusion in this opinion.

11

¶ 28.    If the plain language of the contract, when reviewed alone, is unclear, we may look to "limited extrinsic evidence of circumstances surrounding the making of the agreement" to help resolve whether the contract provision is ambiguous.  Kipp v. Est. of Chips, 169 Vt. 102, 107, 732 A.2d 127, 131 (1999) (quotation omitted).  If, in consideration of limited extrinsic evidence, "no ambiguity is found, then the language must be given effect in accordance with its plain, ordinary and popular sense."  Isbrandtsen v. N. Branch Corp., 150 Vt. 575, 577-81, 556 A.2d 81, 83-85 (1988).  "If the extrinsic evidence in combination with the text of the writing supports a different interpretation to that reached when evaluating the text of the writing alone, and both interpretations are reasonable, then the writing is ambiguous."  Sutton v. Purzycki, 2022 VT 56, ¶ 37, __ Vt. __, __ A.3d __.  Interpretation of an ambiguous contract is a question of fact.  Constr. Drilling, Inc. v. Eng'rs Constr., Inc., 2020 VT 38, ¶ 12, 212 Vt. 323, 236 A.3d 193.

¶ 29.    There are five contract-interpretation questions we need to address.  One, did VWSD breach its contract with Beldock by negotiating with Shullenberger and contracting with Green Lantern?  Two, did VWSD provide Beldock with "satisfactorily executed off-taker agreements" for North Hyde Park and Alburgh Missile Base?  Three, when was Beldock's duty to pay triggered for each asset under the contract?  Four, did Beldock validly exercise his right to disapprove of the off-taker for North Hyde Park or Alburgh Missile Base?  Five, if Beldock did breach as to North Hyde Park or Alburgh Missile Base, was the contract divisible such that he could still purchase Milton?

A.  Negotiations

¶ 30.    First, we address whether VWSD breached its contract with Beldock when the Veves began negotiations with Shullenberger that included discussion of the sale of North Hyde Park, Alburgh Missile Base, and Milton to Green Lantern.  The Beldock contract states: "In the event that there is a failure to pay [VWSD] by [Beldock] for any of the agreed upon sums of money included in the terms above [VWSD] shall retain the right to remarket the assets with no further

12

obligation to the buyer." It accordingly prohibits VWSD from "remarketing" the assets unless and until Beldock fails to make a payment.

¶ 31. On appeal, Beldock argues that VWSD "remarketed" the assets to Green Lantern when the Veves began negotiations with Shullenberger in August 2016, thereby breaching the agreement because Beldock had no obligation to pay for Alburgh Missile Base or North Hyde Park at that time. VWSD counters that its negotiations did not constitute "remarketing" the assets, that it did not enter a written agreement with Green Lantern until after Beldock had failed to make a payment due, and that even the written agreement with Green Lantern was not a "remarketing" of the assets because resale was contingent on valid termination of its contract with Beldock.

¶ 32. We conclude that VWSD did not breach its agreement with Beldock when it began negotiations with Shullenberger prior to VWSD's termination of its agreement with Beldock. The agreement, by its plain terms, unambiguously states that VWSD cannot "remarket" the assets unless Beldock fails to make a payment. To "remarket" something is to put it up for sale again. See Market, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/market#h2 [https://perma.cc/RM26-394F] (defining "market" as "to expose for sale in a market"); Remarket, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/remarket [https://perma.cc/4WHJ-TLEY] (defining "remarket" as "to market (something) again").

¶ 33. Here, VWSD did not put the assets up for sale prior to Beldock's alleged failure to make a payment. The negotiations that took place before the nonbinding term sheet was executed did not expose the Beldock assets for sale because there was no guarantee that VWSD would sell to anyone but Beldock. By the time negotiations developed into a signed, nonbinding term sheet on September 22, 2016, the terms included a carveout for the assets under contract with Beldock. Under this provision, only valid contract termination could expose the assets for sale, consistent with the Beldock contract's terms. Further, the nonbinding term sheet was just that—nonbinding.

13

Developing a contingency plan through negotiations and nonbinding term sheets with explicit carveouts excluding the assets from sale unless the contract with Beldock fell through was not "remarketing" the assets. Therefore, VWSD did not breach its contract with Beldock when the Veves negotiated with Shullenberger.

### B. Off-Taker Form

¶ 34. Next, we ask whether VWSD provided Beldock with "satisfactorily executed off-taker agreement[s]" for North Hyde Park and Alburgh Missile Base. For both assets, one of the deliverables required to trigger Beldock's obligation to pay the requisite development fee was a "satisfactorily executed off-taker agreement which form is attach hereto." As the first part of his argument that his duty to pay had not been triggered because he validly exercised his right to disapprove of the off-takers, Beldock proposes that the form and context of the off-taker agreements VWSD provided were unsatisfactory. Although Beldock's argument on appeal focuses less on the form and more on other aspects of his dissatisfaction with the off-taker agreements, whether use of the form he provided was required under the contract is an essential part of construing this contract. We agree with the trial court that the form of the off-taker agreements is not material under the contract, and we explain why to contextualize our conclusions regarding the construction of other aspects of the agreement. See Constr. Drilling, Inc., 2020 VT 38, ¶ 14 ("[T]he agreement must be viewed in its entirety, with an eye toward giving effect to all material parts in order to form a harmonious whole." (quotation omitted)).

¶ 35. The phrase "satisfactorily executed off-taker agreement" is unambiguous and means the creation of a legally enforceable contract with the off-taker(s). An "executed" document is one "that has been signed" or "that has been done, given or performed." Executed, Black's Law Dictionary (11th ed. 2019); see also 10 Ellicott Square Ct. Corp. v. Mountain Valley Indem. Co., 634 F.3d 112, 120-21 (2d Cir. 2011) (explaining that contracts are "executed" when they are either signed or fully performed). Whether by signature or by performance, "a written agreement is

14

executed when the parties complete the formalities necessary to bring the agreement into its final, legally enforceable form." Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth., 45 F.4th 121, 125 (D.C. Cir. 2022).

¶ 36.     Within the context of this contract, it is evident that the parties intended to create enforceable off-taker agreements via signature rather than performance.  First, the agreement provides Beldock with a right to disapprove of the off-taker, indicating that the parties did not anticipate the off-taker to "execute" the agreement by immediately beginning to perform.  Second, the agreement discusses the "form" of the executed off-taker agreements, which connotes an enforceable written contract.  Third, an off-taker is an entity promising to purchase solar energy produced by the assets, so the off-takers could not perform under the off-taker agreements until the assets were developed and producing solar energy, which had yet to occur here.

¶ 37.     The form used for the off-taker agreements is immaterial to their satisfactory execution under the contract.  When we look at the text of the contract, "which form is attached hereto" seems ambiguous because it is unclear from this statement alone whether the form is required or permissible.  Cf. Hemond v. Frontier Commc'ns of Am., Inc., 2015 VT 67, ¶ 20, 199 Vt. 272, 123 A.3d 1176 (explaining that we first look to language of agreement when assessing a potential ambiguity).  However, it is undisputed that no form was attached to the term sheet—it was, at most, provided in close temporal proximity. Also, the specific form used does not impact the ability of an off-taker agreement to be "executed."  In light of these facts, we conclude that "which form is attached hereto" did not require VWSD to use a specific form provided by Beldock to deliver a "satisfactorily executed off-taker agreement."  See Kipp, 169 Vt. at 107, 732 A.2d at 131 ("We allow limited extrinsic evidence of circumstances surrounding the making of the agreement in determining whether the writing is ambiguous." (quotation omitted)).  The agreement is therefore unambiguous and allows but does not require VWSD to use the form Beldock preferred.  Because the parties do not dispute that VWSD delivered signed, enforceable off-taker

15

agreements, we conclude that VWSD provided satisfactorily-executed off-taker agreements for North Hyde Park and Alburgh Missile Base as a matter of law.

## C. Payment Due

¶ 38. Having established that there was no breach prior to VWSD's delivery of the CPG and off-taker agreements to Beldock and that the off-taker agreements were "satisfactorily executed," we must determine when Beldock was required to pay the development fee for North Hyde Park and Alburgh Missile Base. To prove that he did not breach when he undisputedly did not pay for these two assets, Beldock must demonstrate that he was not obliged to do so. Beldock asserts that he did not fail to make required payments because no payment was due. For Alburgh Missile Base, he proposes that the contract unambiguously provides that he was entitled to reject the asset based on the deliverables and therefore was not required to pay. For North Hyde Park, he proposes that he was not required to pay until VWSD provided additional documentation that he requested. He suggests that the contract implied a reasonable period for him to review the deliverables before payment was due. If we disagree with his readings of the contract regarding when payment was due, Beldock proposes that the contract is ambiguous. VWSD asserts, and the trial court agreed below, that Beldock was required to pay "upon delivery" of the CPG and off-taker agreements, meaning he had to pay the moment that he received the deliverables for both North Hyde Park and Alburgh Missile Base.

¶ 39. For North Hyde Park and Alburgh Missile Base, the agreement provides that the respective development fee is due "upon delivery" of the CPG and off-taker agreements. In the next sentence, the agreement states that Beldock has "the right to disapprove of the off-taker based upon the reasonable financial viability and credit worthiness of the off-taker." "[T]he sale of each of these assets is 'as is' upon the satisfactory delivery of each element" required under the agreement's terms.

¶ 40. The duty to pay "upon delivery" of the off-taker agreement and the "right to disapprove of the off-taker" are in direct conflict. Although "[w]e are obligated to harmonize the two provisions at issue if they may be harmonized," Constr. Drilling, Inc., 2020 VT 38, ¶ 19, a harmonious reading is not always possible. When read alone, "upon delivery" plainly obligates a contemporaneous exchange of the deliverables and payment. However, if Beldock was required to pay before being given the opportunity to conduct reasonable due diligence on the financial viability and credit worthiness of the off-taker, this would render his right to disapprove of the off-taker a nullity. On the other hand, if we attempt to read in a certain amount of time for Beldock to review the off-takers before payment is due, then payment is not in fact due "upon delivery." When two provisions of a contract conflict, and we are unable to resolve this conflict when reading the contract as a whole, then the contract is ambiguous. See Klapp v. United Ins. Grp. Agency, Inc., 663 N.W.2d 447, 453 (Mich. 2003) ("[I]f two provisions of the same contract irreconcilably conflict with each other, the language of the contract is ambiguous."); see also Madowitz v. Woods at Killington Owners' Ass'n, 2010 VT 37, ¶ 17, 188 Vt. 197, 6 A.3d 1117 (declining to read together multiple documents as single contract where there was "no harmonious way to read . . . conflicting provisions" as doing so would render provisions ambiguous). These contract provisions cannot be reconciled.

¶ 41. When the plain language of an agreement is ambiguous, we may look to "limited extrinsic evidence of circumstances surrounding the making of the agreement" to see if this resolves the ambiguity. Kipp, 169 Vt. at 107, 732 A.2d at 131 (quotation omitted). Doing so does not resolve the conflicting provisions at issue here. The parties do not point us to, nor can we find, undisputed material facts pertaining to the formation of this contract that could illuminate our construction of this provision. To the extent Beldock encourages us to look at course of performance, specifically the parties' closing of North Troy, to conclude that the contract unambiguously requires a reasonable period of time for due diligence between delivery and

17

payment, post-agreement conduct is beyond the scope of evidence we may look to when determining if a contract provision is ambiguous. See Highridge Condo. Owners Ass'n v. Killington/Pico Ski Resort Partners, LLC, 2014 VT 120, ¶ 22, 198 Vt. 44, 111 A.3d 427 (explaining that course of performance may only be relevant after first finding ambiguity in contract).[9] We also have no guidance from the contract's text or the circumstances of its signing regarding how long a reasonable period of time for inspection might be. We will not invent a contract provision setting an inspection period unspecified by the parties themselves in order to avoid a conclusion that this provision is ambiguous. See Downtown Barre Dev. v. C & S Wholesale Grocers, Inc., 2004 VT 47, ¶ 9, 177 Vt. 70, 857 A.2d 263 (explaining that "[v]aguely implied conditions may not be inserted into an agreement"). We conclude that the agreement is ambiguous with regard to the timing of payment.

## D. Right to Disapprove

¶ 42. As identified in the previous section, there is also dispute regarding Beldock's "right to disapprove of the off-taker based upon the reasonable financial viability and credit worthiness of the off-taker." Beldock has continuously maintained that he validly exercised his contractual right to disapprove of the off-taker for Alburgh Missile Base. Because we do not know, as a matter of law, when payment was due under the agreement, we are unable to construe this provision and therefore are unable to determine whether Beldock validly exercised this right. However, we provide some guidance for the trial court on remand.

¶ 43. Depending on when payment was due, interpretation of this provision may be irrelevant. If payment was due upon delivery and the right to disapprove is hollow, then Beldock was in breach when he failed to pay on the day of delivery, regardless of whether he validly

---

[9] The factfinder, however, may rely on course of performance as an indicator of the parties' intent when construing an ambiguous agreement. See B & C Mgmt. Vt., Inc. v. John, 2015 VT 61, ¶ 13, 199 Vt. 202, 122 A.3d 511.

exercised his right to disapprove of the off-taker. If the agreement anticipates a reasonable amount of time for due diligence and that time had passed before Beldock purported to reject the off-taker, then Beldock was in breach when he did not pay and whether he exercised his right to disapprove of the off-taker for Alburgh Missile Base is immaterial. However, if the agreement anticipates a reasonable amount of time for due diligence and that reasonable period had not passed by the time Beldock sent the email purporting to reject the off-taker for Alburgh Missile Base, then whether Beldock validly exercised his right to disapprove of the off-taker is material. In the event of this third scenario, the factfinder would need to determine whether Beldock actually exercised this right, as he contests, or whether he repudiated the agreement, as VWSD contests.

¶ 44. The interpretation and application of this contract provision is entirely dependent on our preceding question: when was payment due? Without an answer, we cannot begin to wade through the viability of various hypothetical outcomes. This aspect of the contract is ambiguous.

### E. Divisibility

¶ 45. Our final question of contract interpretation is whether the agreement is divisible. Beldock asserts that, even if he breached the contract with respect to one or both of North Hyde Park and Alburgh Missile Base, VWSD was still under an obligation to fulfill the contract as to Milton. VWSD counters that any failure to pay on Beldock's part for any individual asset permitted VWSD to terminate the contract and remarket all the assets, including Milton, to a third party, in this case Green Lantern.

¶ 46. A divisible, or severable, contract is one "that includes two or more promises each of which can be enforced separately, so that failure to perform one of the promises does not necessarily put the promisor in breach of the entire contract." Severable Contract, Black's Law Dictionary (11th ed. 2019). Generally, a contract is divisible "when by its terms, nature, and purpose, it is susceptible of division and apportionment." Four Oaks Conservation Tr. v. Bianco, 2006 VT 6, ¶ 5, 179 Vt. 597, 892 A.2d 258 (mem.) (quotation omitted). Whether a contract is

19

divisible is a matter of contract interpretation and follows our typical steps to ascertain the parties' intent. Id. " 'There is a presumption against finding a contract divisible, unless divisibility is expressly stated in the contract itself, or the intent of the parties to treat the contract as divisible is otherwise clearly manifested.' " Id. (quoting 15 R. Lord, Williston on Contracts § 45:4, at 275 (4th ed. 2000)).

¶ 47. The contract can reasonably be interpreted in two ways. First, it is reasonable to conclude that the agreement is not divisible. There is a presumption against divisibility. Id. The agreement anticipates the sale of all four assets, as demonstrated by the presence of multiple overarching clauses applicable to all the assets found at the end of the agreement. The agreement allows VWSD to "remarket the assets," (emphasis added), if Beldock fails to pay for "any of the agreed upon sums of money," which indicates that any breach regarding payment is material and would warrant cancellation of the entire contract. Under this reading, the "individual sales" language and clauses on unique deliverables and fees for each asset simply reflect negotiations and allow for a stagnated timeline for deliverables and payments.

¶ 48. On the other hand, it is also reasonable to conclude that the agreement is divisible. The agreement opens by explaining that it is for "the individual sales of certain assets," indicating an intent for each sale to be separate. Moreover, each asset is listed separately with its own unique terms, making it practical to enforce the sale of each asset as an individual unit. For each asset, Beldock has a right to disapprove of the off-taker, and disapproval of one off-taker does not disrupt moving forward with approved off-takers for other assets. Under this reading, the general provisions at the end of the agreement fit in by simply being applicable to each sale. This interpretation is also more compatible with VWSD's ability to remarket assets upon a failure to pay. If the failure-to-pay clause is read literally and the contract is not divisible, then VWSD could potentially remarket North Troy, an asset for which Beldock paid and on which the parties already closed.

20

¶ 49. Here, because we have two reasonable interpretations of the written contract concerning divisibility, the contract is ambiguous in this regard. See In re Spear, 2014 VT 57, ¶ 18, 196 Vt. 517, 99 A.3d 618 (stating that when writing itself "is susceptible to two reasonable interpretations," it is ambiguous).

F. Conclusion

¶ 50. In sum, our construction of the contract is as follows. As a matter of law, VWSD did not breach the contract when the Veves engaged in negotiations with Shullenberger or signed the nonbinding term sheet with Green Lantern, and VWSD provided Beldock with satisfactorily executed off-taker agreements for North Hyde Park and Alburgh Missile Base. However, the contract is ambiguous regarding the remaining issues raised on appeal: when payment was due; the effect of the "right-to-disapprove" clause; and whether the contract is divisible. When an agreement is ambiguous, the parties' intent becomes a question of fact. See City of Newport v. Vill. of Derby Ctr., 2014 VT 108, ¶ 6, 197 Vt. 560, 109 A.3d 412. When a genuine dispute about a material fact remains, summary judgment is inappropriate. Dep't of Corr. v. Matrix Health Sys., P.C., 2008 VT 32, ¶ 11, 183 Vt. 348, 950 A.2d 1201. The fate of Beldock's claim and VWSD's counterclaim hinge on the outcome of some or all of these three remaining material questions of fact. Accordingly, we reverse the trial court's grant of summary judgment in favor of VWSD on Beldock's breach claim and in part on its own breach counterclaim.[10]

IV. Good Faith and Fair Dealing

¶ 51. Beldock's second claim is that VWSD breached the implied covenant of good faith and fair dealing. On appeal, he argues that VWSD breached the implied covenant by remarketing

---

[10] Because we reverse the trial court's grant of partial summary judgment on VWSD's counterclaim for breach of contract on the bases stated above, we do not need to reach Beldock's argument that partial summary judgment may not be granted on a breach-of-contract claim where the claimant has yet to prove damages.

the assets, negotiating with Shullenberger and Green Lantern for a higher price, and keeping those negotiations secret from Beldock.[11] In addition, he proposes that VWSD's conduct throughout the litigation below, such as failing to comply with certain procedural rules during discovery and providing testimony in which Will Veve deliberately misrepresented facts, violated the implied covenant as well.

¶ 52.    "An underlying principle implied in every contract is that each party promises not to do anything to undermine or destroy the other's rights to receive the benefits of the agreement." Carmichael v. Adirondack Bottled Gas Corp. of Vt., 161 Vt. 200, 208, 635 A.2d 1211, 1216 (1993); see also Restatement (Second) of Contracts § 205 cmt. a (explaining that implied covenant exists to ensure parties act with "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party").  The implied covenant extends to "actions taken in fulfillment of a contract" and "actions taken in terminating a contract and winding up the contractual relationship between the parties." Tanzer v. MyWebGrocer, Inc., 2018 VT 124, ¶ 32, 209 Vt. 244, 203 A.3d 1186.  Good faith and fair dealing is "[c]ontextual and fact-specific," and accordingly "is ordinarily a question of fact." Carmichael, 161 Vt. at 208-09, 635 A.2d at 1216-17.

¶ 53.    To the extent that Beldock's claim for breach of the implied covenant is duplicative of his breach-of-contract claim, it cannot be sustained as a matter of law.  "Where a party alleges both breach of contract and breach of the implied covenant of good faith and fair dealing, dual causes of action are permitted only where the different actions are premised on different conduct . . . ." Tanzer, 2018 VT 124, ¶ 33.  Although Beldock insists that the two claims are

---

[11]    Below, Beldock additionally proposed that VWSD's violative conduct included: providing deficient deliverables, demanding payment before Beldock could conduct due diligence, improperly terminating the contract, and setting up Beldock to make it seem like he breached the agreement in order to justify contract termination.  Because these arguments are not briefed on appeal, they are waived. McAdams v. Town of Barnard, 2007 VT 61, ¶ 8, 182 Vt. 259, 936 A.2d 1310.

premised on separate conduct, there is some overlap. VWSD's "remarketing" of the assets to Green Lantern is the basis of his breach of contract claim. Beldock insists that negotiations are a form of "remarketing" rendering the negotiations portion of his implied covenant claim duplicative as well. Although he adds that the negotiations were for a higher price, simply providing the motivations for VWSD's alleged breach is insufficient to establish that the two causes of action are premised on different conduct. See Ferrisburgh Realty Invs. v. Schumacher, 2010 VT 6, ¶ 26, 187 Vt. 309, 992 A.2d 1042 (concluding that plaintiff failed to identify conduct distinct from breach-of-contract claim where good-faith-and-fair-dealing claim focused solely on defendant's motivation for breach).

¶ 54. When we remove the duplicative conduct, what remains is Beldock's claim that the confidentiality and exclusivity clauses in VWSD's agreements with Green Lantern violated the implied covenant. In other words, he proposes that VWSD's failure to tell him about the negotiations is a violation. We cannot agree. The Veves' negotiations with Shullenberger to develop a backup plan for sale of the assets in the event that Beldock failed to pay did not undermine Beldock's contract rights. See Carmichael, 161 Vt. at 208, 635 A.2d at 1216 (stating that good faith and fair dealing prohibits party from acting to "undermine or destroy" another party's rights under agreement). Regardless of whether Beldock knew about these negotiations, VWSD could not validly terminate its contract with Beldock absent his failure to pay. The exclusivity clauses do not undermine his rights either because he was not entitled to VWSD's assets outside the four under contract with him and the term sheets contained carveouts for the Beldock assets, acknowledging his rights under his contract with VWSD. Further, the exclusivity provision applied only to the extent Beldock failed to pay and the contract was validly terminated, at which point VWSD would have been within its rights to remarket with no additional obligations to Beldock anyway. Moreover, as previously stated, to the extent that Beldock's implied-covenant

claim is really about VWSD's transaction with Green Lantern, he already alleges that that transaction is a breach of contract.

¶ 55.    We now turn to the other type of conduct Beldock alleges violates the implied covenant: VWSD's litigation practices.  Litigation conduct may violate the implied covenant; however, a proponent faces a "high bar."  Tanzer, 2018 VT 124, ¶ 40.  Violative litigation conduct "must fall within the narrow scope of dishonest conduct"—"such as conjuring up a pretend dispute, asserting an interpretation contrary to one's own understanding, or falsification of facts."  Id. ¶¶ 32, 40 (quotation omitted).

¶ 56.    We reject Beldock's argument that VWSD's discovery practices support an implied-covenant claim.  Although Beldock proposes that VWSD delayed its discovery responses to conceal its transaction with Green Lantern and close on that sale, there is no evidence in the record to support this statement.  Beldock filed his complaint on November 23, 2016.  Service was completed on December 2.  VWSD and Green Lantern closed on the sale of North Hyde Park, Alburgh Missile Base, and Milton on December 12.  Under the Vermont Rules of Civil Procedure, VWSD's answer was not even due by the time the sale to Green Lantern closed.  V.R.C.P. 12(a)(1)(A) (requiring defendant to serve answer within twenty-one days after being served with summons and complaint).  VWSD could not have breached the implied covenant by delaying discovery in order to close on its sale, because at the time of closing, no answer or discovery was due.

¶ 57.    Further, his other complaints about delays concern conduct occurring after closing, and Beldock points to no evidence demonstrating that VWSD's conduct was in bad faith or undermined his ability to vindicate his contract rights.  See Tanzer, 2018 VT 124, ¶ 40 (distinguishing between "litigation conduct that is an aggressive prosecution or defense" and "litigation conduct that reflects dishonesty" and clarifying that only latter violates implied covenant); Carmichael, 161 Vt. at 208, 635 A.2d at 1216 (explaining that key principle for implied

24

covenant is promise not to "undermine or destroy the other's rights to receive the benefits of the agreement"). First, he points to VWSD's January 2017 response to his interrogatories. There, VWSD admitted to offering the assets for sale to a third party but refused to "produce all communications" between it and any third party concerning the assets and to "provide all documentation" relating to the offer for sale to a third party. VWSD's objection argued that the request was overbroad and unduly burdensome but indicated that it would produce discoverable documents in response to a more tailored request.

¶ 58. Though Beldock opines that he filed multiple motions to compel, he does not point to parts of the record for this Court to review those motions and see how they fared. However, the record reflects that Beldock was awarded attorney's fees associated with VWSD's failure to file a timely and complete expert disclosure. We do not see how the existence of this successful motion to compel alone shows VWSD's bad faith litigation with respect to the contract. See Tanzer, 2018 VT 124, ¶¶ 32,40 (stating that violative litigation conduct is limited to "dishonest conduct" like "conjuring up a pretend dispute, asserting an interpretation contrary to one's own understanding, or falsification of facts"). In sum, Beldock points to no evidence that VWSD purposefully delayed the litigation in a way that undermined his rights and was dishonest. As a matter of law, the conduct identified alone cannot sustain his implied-covenant claim.

¶ 59. Lastly, he accuses Will Veve of deliberately misrepresenting facts concerning his negotiations with Green Lantern in an effort to frustrate Beldock's ability to enforce his contractual rights. During a motion hearing, Will Veve testified that he "didn't know the exact date, prior to. . . doing the term sheet" when he started talking with Green Lantern about its purchasing the Beldock assets. Despite not knowing the exact dates, he insisted that VWSD "only contacted Green Lantern after [it] was not paid" by Beldock. Because VWSD did not provide him with the Alburgh deliverables until August 31 and it is undisputed that VWSD and Green Lantern began communications sometime in August, Beldock proposes that Will Veve purposefully

25

misrepresented this timeline. VWSD counters that Will Veve's testimony referred to whether VWSD entered an agreement with Green Lantern before payment was due and was not inaccurate. Despite this disagreement, there is no genuine dispute as to a material fact preventing grant of summary judgment on this issue. Even assuming Will Veve purposefully misrepresented the timeline during his testimony, Beldock has not pointed to any evidence to show how this claimed lie undermined or destroyed his contract rights. When VWSD began negotiating with Green Lantern is immaterial—it is neither a breach of the contract nor of the implied covenant to develop a backup plan in the event of a valid contract termination. Thus, the testimony did not undermine Beldock's ability to assert his contract rights in court.[12]

¶ 60. As a matter of law, Beldock did not have a viable claim for breach of the implied covenant of good faith and fair dealing against VWSD. None of the facts in dispute can alter this conclusion. See Boulton v. CLD Consulting Eng'rs, Inc., 2003 VT 72, ¶ 12, 175 Vt. 413, 834 A.2d 37 (acknowledging that whether implied covenant was breached is ordinarily question of fact for jury but affirming grant of summary judgment in favor of defendant where facts alleged by plaintiff did "not come close to providing a basis on which a jury could determine" that implied covenant was violated). Nor may he rely on "mere allegations" at the summary judgment stage to attempt to save his claim. White, 170 Vt. at 28, 742 A.2d at 736. It was his burden to "set forth specific facts showing that there is a genuine issue for trial." V.R.C.P. 56(e). He has not done so here. Accordingly, the trial court's grant of summary judgment in favor of VWSD on this claim was appropriate.

---

[12] Defendants also argued that the trial court's summary disregard of this argument was correct because the allegations of litigation misconduct are absent from Beldock's complaint. We do not need to reach this argument.

## V. Tortious Interference

¶ 61. We now turn to Beldock's claim against Shullenberger and Green Lantern for tortious interference with contract. The trial court granted summary judgment in favor of Shullenberger and Green Lantern on this claim because it concluded that VWSD performed its contractual obligations and therefore Shullenberger and Green Lantern could not have interfered with the contract. On appeal, Beldock argues that his tortious-interference claim should be revived because the trial court erroneously concluded that VWSD performed its contractual obligations as a matter of law and that no material facts remained in dispute. He proposes that the record contains ample evidence to support his claim that Shullenberger and Green Lantern intentionally and improperly induced VWSD to breach its contract with him. Defendants counter that the undisputed material facts demonstrate that Green Lantern's negotiations with VWSD did not interfere with VWSD's contract with Beldock and that VWSD fully performed its contractual obligations.

¶ 62. We have long recognized that a defendant is liable for tortious interference with contract where he " 'intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract.' " Williams v. Chittenden Tr. Co., 145 Vt. 76, 80, 484 A.2d 911, 913 (1984) (quoting Restatement (Second) of Torts § 766 (1979)). Because "there is no legal right to knowingly invade the contract relation of others solely to promote the intervenor's financial interest," a defendant "who prevents performance by offering a better price" is liable under this standard. Mitchell v. Aldrich, 122 Vt. 19, 25, 163 A.2d 833, 837 (1960). "To recover, the plaintiff must have suffered harm from the interference, which includes such loss as the plaintiff can prove to have resulted directly and proximately from the defendant's wrongful acts." Kneebinding, Inc. v. Howell, 2018 VT 101, ¶ 93, 208 Vt. 578, 201 A.3d 326 (citation and quotation omitted).

¶ 63.    As explained above, VWSD did not breach its contract with Beldock by entering negotiations with third parties.  See supra, Part III.A.  Accordingly, Shullenberger and Green Lantern did not commit tortious interference by inviting VWSD to the negotiating table because this in itself did not cause VWSD's nonperformance on its contract with Beldock.  Williams, 145 Vt. at 80, 484 A.2d at 913 (including "inducing or otherwise causing third person to not perform" as element of tortious interference with contract) (quotation omitted)).  Our analysis in this section focuses on Beldock's contention that Shullenberger and Green Lantern improperly induced VWSD to breach their contract by selling North Hyde Park, Alburgh Missile Base, and Milton to Green Lantern instead of Beldock.

¶ 64.    We conclude that Beldock's tortious-interference claim fails as a matter of law because an offer, even if for a better price, that essentially creates a backup plan in the event of a breach and valid contract termination is not improper interference.  The nonbinding term sheet expressly provides that the Beldock assets were "not to be included until valid termination of contract has been received."  The MAPA also acknowledges that VWSD could be precluded from selling the assets to Green Lantern because of its contract with Beldock.  Under the Beldock contract, VWSD was permitted to remarket assets if Beldock failed to pay one of the agreed upon sums of money.  Thus, VWSD could not validly terminate its contract with Beldock for any or all assets without a failure to pay on Beldock's part.  If, as Beldock contends, VWSD did not deliver the necessary documents to trigger Beldock's duty to pay, then VWSD would never be able to remarket the assets.  In other words, the only way that VWSD could sell the assets to Green Lantern was to fully perform and wait to see if Beldock failed to pay when obliged to do so.  To the extent that VWSD breached the agreement because it remarketed the assets before payment was due, this was not required or invited by its nonbinding or binding agreements with Green Lantern.  Accordingly, we conclude as a matter of law that the execution of Shullenberger and Green Lantern's nonbinding term sheet with VWSD was not improper interference.  See Fin. Mktg.

_Servs., Inc. v. Hawkeye Bank & Tr. of Des Moines_, 588 N.W.2d 450, 458 (Iowa 1999) (concluding at summary-judgment stage that defendant's conduct was not improper as matter of law).

¶ 65.     Although Beldock contends that VWSD performed deficiently under the contract because of its negotiations with Green Lantern in order to create an excuse to remarket the assets to Green Lantern, this is immaterial in light of our reasoning above.  For these same reasons we are not persuaded by Beldock's argument that the existence of drafts of the nonbinding term sheet that contained no carveouts for the Beldock assets demonstrates that Shullenberger and Green Lantern intentionally induced VWSD to breach.  The resulting nonbinding term sheet, described above, contained a carveout and required valid contract termination.  The offer Green Lantern made, assuming without deciding that it was for a better price, could therefore only be accessed if VWSD validly terminated its contract with Beldock upon his failure to pay.  The MAPA reflected this same requirement with its carveout provisions.  Tortious interference with contract requires more than a party failing to perform—improper interference on behalf of the defendant is required. In light of the carveouts in the nonbinding term sheets and MAPA, we cannot conclude that improper interference occurred here.

¶ 66.     As a matter of law, based on the uncontested material facts available, Beldock does not have a viable claim for tortious interference with contract against Green Lantern and Shullenberger.  The trial court properly granted summary judgment in favor of Green Lantern and Shullenberger on this claim.

### VI.  Unjust Enrichment

¶ 67.     Finally, we turn to Beldock's unjust-enrichment claims against VWSD, Shullenberger, and Green Lantern.  With this claim, Beldock seeks compensation for work he alleges he put into the development of the assets with the expectation that he would be purchasing them.  The trial court granted summary judgment in favor of all three defendants on this claim.  It concluded that Beldock did not have a claim for four reasons.  First, Beldock could not have an

29

unjust-enrichment claim against Green Lantern and Shullenberger because they had no direct relationship with him. Second, any benefits conferred were incidental and therefore not the proper subject of an unjust-enrichment claim. Third, Beldock had an adequate remedy at law for breach of contract and was not entitled to equitable remedies. Fourth, in light of the totality of the circumstances, any enrichment to the defendants was not unjust. On appeal, Beldock argues that all four of these conclusions are in error.

¶ 68. "Under the doctrine of unjust enrichment, a party who receives a benefit must return the benefit if retention would be inequitable." Kellogg v. Shushereba, 2013 VT 76, ¶ 20, 194 Vt. 446, 82 A.3d 1121 (quotation and alterations omitted). To succeed on a claim for unjust enrichment, a "plaintiff must prove that (1) a benefit was conferred on defendant; (2) defendant accepted the benefit; and (3) defendant retained the benefit under such circumstances that it would be inequitable for defendant not to compensate plaintiff for its value." Center v. Mad River Corp., 151 Vt. 408, 412, 561 A.2d 90, 93 (1989). Whether a party has been unjustly enriched is a question of fact; however, whether a claim for unjust enrichment can be maintained, given certain facts, is a legal question reviewed de novo. McLaren v. Gabel, 2020 VT 8, ¶ 20, 211 Vt. 591, 229 A.3d 422. When a party can maintain a claim for unjust enrichment, "we give deference to the trial court's decision to grant or withhold equitable remedies" and accordingly review the trial court's decision for an abuse of discretion. Id. ¶ 21.

A. Green Lantern and Shullenberger

¶ 69. Beldock's unjust-enrichment claim against Green Lantern and Shullenberger fails as a matter of law. Assuming without deciding that a benefit—aid in development of the solar assets—was conferred on Green Lantern and Shullenberger and they accepted the benefit, under the undisputed material facts of this case, we conclude that retention of this benefit is not inequitable. "The retention of a benefit is not unjust where defendants have paid for it." Morrisville Lumber Co. v. Okcuoglu, 148 Vt. 180, 184, 531 A.2d 887, 889 (1987). We have twice

30

before declined to recognize a claim for unjust enrichment where the result would be to require the defendant to pay twice for the same product or service. Id.; DJ Painting, Inc. v. Baraw Enters., Inc., 172 Vt. 239, 244, 776 A.2d 413, 418 (2001). In Morrisville Lumber Co., we denied the subcontractor's unjust-enrichment claim against the owner for materials the subcontractor supplied to the general contractor where the owner paid the general contractor for all the benefits that the owner had received. 148 Vt. at 184, 531 A.2d at 889. We concluded so again in DJ Painting, Inc. on similar facts, the only difference being the subcontractor sought payment for services rather than materials. 172 Vt. at 243-44, 776 A.2d at 417-18. Here, Green Lantern and Shullenberger contracted with VWSD for the sale of the assets, and it is undisputed that they closed on the sale. That sale included any work that Beldock put in to assist VWSD in its development the assets. Accordingly, Green Lantern and Shullenberger paid for any benefits conferred to them. This case is analogous to Morrisville Lumber Co. and DJ Painting, Inc., and Beldock does not have an unjust-enrichment claim against these two defendants.

¶ 70. Beldock concedes the factual similarities between these precedents and the present case but attempts to distinguish them by arguing the defendants in those cases were "innocent" whereas here the defendants knew of Beldock's work and induced VWSD to breach thereby benefitting from his work. This is inapposite. An argument that Green Lantern and Shullenberger tortiously interfered with Beldock's contract—one we already rejected above—cannot sustain his claim that they were unjustly enriched. The two causes of action are distinct. See, e.g., Fred Ezra Co. v. Psychiatric Inst. of Washington, D.C., 687 A.2d 587, 589 (D.C. 1996) (affirming grant of summary judgment on unjust enrichment but reversing grant of summary judgment on tortious interference with contract); Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A., 579 N.Y.S.2d 353, 354 (App. Div. 1992) (mem.) (reversing dismissal on unjust enrichment but affirming dismissal on tortious interference with contract). Even assuming that Green Lantern and Shullenberger benefited from Beldock's work, they undisputedly paid VWSD for the assets

31

including any development to which Beldock contributed, and we will not require them to pay for the same assets twice. The trial court properly granted summary judgment in favor of Green Lantern and Shullenberger on Beldock's unjust-enrichment claim against them.

## B. VWSD

¶ 71. Moving on to the claim against VWSD, we conclude that none of the remaining three arguments support the trial court's grant of summary judgment in favor of VWSD. As a preliminary matter, VWSD contends that no benefit at all was conferred. The parties dispute whether the assistance Beldock allegedly provided in acquiring certain deliverables and discussing project details necessary for the eventual construction of the solar projects was a material benefit. It is undisputed that there was some level of coordination and input between Beldock's and VWSD's teams for acquiring the deliverables. If, in fact, this coordination on Beldock's behalf was valuable and, in some form, spared VWSD necessary expenses in terms of obtaining important documents for its development and sale of the assets, then a benefit was conferred. Looking at the evidence in the light most favorable to Beldock as the nonmoving party, we can infer from the existence of the coordination that there was some value to what Beldock's team provided. See Lawson, 2019 VT 38, ¶ 21 (stating that nonmoving party is entitled to "benefit of all reasonable doubts and inferences" (quotation omitted)). Because a question of fact remains as to whether a benefit was conferred, we will assume without deciding that some benefit was conferred for purposes of our analysis in the proceeding subsections.

### i. Incidental Benefits

¶ 72. The trial court's general observation that incidental benefits are rarely recoverable is insufficient to justify a grant of summary judgment on the unjust-enrichment claim here. Citing § 30 of the Restatement Third of Restitution and Unjust Enrichment, we have stated that:

> a claim of unjust enrichment for benefits conferred on the recipient by the claimant's unrequested intervention is available only to the extent that "(a) liability in restitution replaces a money obligation or

32

spares the recipient necessary expense; (b) the recipient obtains a benefit in money; or (c) relief may be granted to the claimant by specific restitution."

Birchwood Land Co. v. Krizan, 2015 VT 37, ¶ 11, 198 Vt. 420, 115 A.3d 1009 (quoting Restatement (Third) of Restitution and Unjust Enrichment § 30 (2011)). One principle underlying § 30 is "a claimant generally cannot compel the recipient to pay for benefits voluntarily conferred if, had the transaction been proposed as a contract, the recipient would have been able to reject it." Id. As a result, "incidental benefits—benefits conferred on the recipient by work that the claimant undertook for its own benefit—rarely are recoverable in restitution unless the benefits are a consequence of mistake, fraud, or compulsion." Id. ¶ 14.

¶ 73. The language of § 30 and our case law applying it are not absolute. In the preceding paragraph, the rules are stated in terms of "generally" and "rarely." This is because § 30, by name and purpose, is a residual rule. The structure of the Restatement lists various, common situations in which a claimant may secure restitution for unrequested benefits in § 20 through § 29, and then § 30 provides guidance on situations "[o]utside the scope of the foregoing sections." Restatement (Third) of Restitution and Unjust Enrichment § 30; cf. also Birchwood, 2015 VT 37, ¶ 18 (adopting and analyzing Restatement § 26, which we characterized as "an exception to the general prohibition on restitution for voluntarily conferred benefits").

¶ 74. Here, the parties dispute whether any benefit was conferred and whether the benefits, if conferred, spared VWSD necessary expenses. It is also pertinent that Beldock conferred these alleged benefits on VWSD's property in anticipation of ownership, which implicates an exception to the general rule stated in § 30, although one we have not yet adopted. See Restatement (Third) of Restitution and Unjust Enrichment § 27 ("If the claimant makes expenditures to maintain, improve, or add value to property that the claimant reasonably expects to retain or to acquire, and (because such expectation is frustrated) another person becomes the unintended beneficiary of the claimant's expenditure, the claimant is entitled to restitution from

the other as necessary to prevent unjust enrichment."). Because there is a question of fact as to whether an unrequested benefit was conferred and, if conferred, could sustain a claim for unjust enrichment, the incidental-benefit reasoning cannot justify a grant of summary judgment here.

## ii. Existence of Contract

¶ 75. Next, we must ask whether summary judgment to VWSD was appropriate on this claim because an unjust-enrichment claim cannot be maintained where a valid, enforceable contract between the parties exists. Our precedent lacks clarity on this issue.[13] Beldock argues that his claim should proceed to trial because our precedent allows a plaintiff to plead alternative theories of relief and because we have addressed unjust-enrichment and breach-of-contract claims together in previous cases.

¶ 76. When addressing a question regarding unjust enrichment where our case law is lacking, we have often turned to the Restatement for guidance. Birchwood Land Co., 2015 VT 37, ¶ 9. The Restatement provides: "A valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment." Restatement (Third) of Restitution and Unjust Enrichment § 2(2). This is the rule of a number of states. See, e.g., Axenics, Inc. v. Turner Constr. Co., 62 A.3d 754, 764 (N.H. 2013); Town of New Hartford v. Conn. Res. Recovery Auth., 970 A.2d 592, 612 (Conn. 2009); see also Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc., 747 A.2d 600, 607-08 & n.8 (Md. 2000)

---

[13] Compare, e.g., Soon Kwon v. Edson, 2019 VT 59, ¶ 27, 210 Vt. 557, 217 A.3d 935 ("The existence of a contract does not preclude recovery pursuant to an unjust-enrichment claim, but the existence of a contract and the terms of that contract are highly relevant in determining whether denying further payment is unjust." (quotation and alteration omitted)), with Masiello Real Est., Inc. v. Matteo, 2021 VT 81, ¶ 29, 215 Vt. 607, 266 A.3d 1243 (concluding that, to extent plaintiff sought compensation for actions defendant took during contract term, plaintiff could not recover under theory of quantum meruit); see also In re Est. of Elliott, 149 Vt. 248, 253 n.2, 542 A.2d 282, 285 n.2 (1988) (explaining that unjust enrichment and quantum meruit are very similar but differ in measuring damages).

(collecting cases); <u>Zarum v. Brass Mill Materials Corp.</u>, 134 N.E.2d 141, 143 (Mass. 1956). In fact, Beldock points us to no state supreme court that has rejected this rule.

¶ 77.    Notably, the rule is not absolute. A valid contract displaces any inquiry into unjust enrichment as to "matters within its scope." Restatement (Third) of Restitution and Unjust Enrichment § 2(2). In other words, "when an express contract does not fully address a subject, a court of equity may impose a remedy to further the ends of justice." <u>Conn. Res. Recovery Auth.</u>, 970 A.2d at 612 (quotation omitted). Consequently, unjust enrichment applies in the contract context only when a party renders "a valuable performance" or confers a benefit upon another under a contract that is invalid, voidable, "or otherwise ineffective to regulate the parties' obligations." <u>Associated Mgmt. Servs., Inc. v. Ruff</u>, 2018 MT 182, ¶ 67, 424 P.3d 571 (quotation omitted).

¶ 78.    The rule is also well reasoned. Unjust enrichment provides "relief for a plaintiff when an enforceable contract does not exist but fairness dictates that the plaintiff receive compensation." <u>Cnty. Comm'rs of Caroline Cnty.</u>, 747 A.2d at 607 (quotation omitted). "The doctrine does not operate to rescue a party from the consequences of a bad bargain." <u>Washa v. Miller</u>, 546 N.W.2d 813, 819 (Neb. 1996); see also <u>S & M Constructors, Inc. v. City of Columbus</u>, 434 N.E.2d 1349, 1354 (Ohio 1982) (explaining that it is basic tenant of contract law that party who agrees to perform under contract will not be entitled to additional compensation in event of unforeseen difficulties with performance). To conclude otherwise would be "a subversion of contractual principles." <u>Lipshie v. Tracy Inv. Co.</u>, 566 P.2d 819, 824 (Nev. 1977). We accordingly adopt the rule articulated in the Restatement § 2.[14]

---

[14]    To the extent <u>Matteo</u> appears to undermine <u>Soon Kwon</u>, this rule brings them into harmony without changing the outcome in either case. As explained in comment c to Restatement § 2, "[r]estitution claims of great practical significance arise in a contractual context, but they occur at the margins, when valuable performance has been rendered under a contract that is invalid, or subject to avoidance, or otherwise ineffective to regulate the parties' obligations." However, because "contract is superior to restitution as a means of regulating voluntary transfers,"

¶ 79. Having adopted the general rule, we now turn to its application in this case. First, Beldock's citation to Vermont Rule of Civil Procedure 8(e)(2), which permits parties to plead alternative and inconsistent claims, does not resolve our inquiry. We need not decide here whether Beldock could plead unjust enrichment as an alternative theory of relief to his breach-of-contract claim. This case is well past the pleadings stage. The question is whether Beldock may proceed to trial on his unjust-enrichment claim considering the undisputed material facts of this case. See V.R.C.P. 56(a); King v. Baylor Univ., 46 F.4th 344, 367-68 (5th Cir. 2022) (stating that even where state law permits alternative theories of relief, once court determines that valid, express contract governs subject matter of parties' dispute, there can be no recovery under unjust-enrichment claim). But see In re Gen. Motors LLC Ignition Switch Litig., 339 F. Supp. 3d at 333-42 (identifying nine states that allow pleading unjust enrichment in alternative only where validity or enforceability of contract is in question). He may not do so if his unjust-enrichment claim addresses the same subject matter as his undisputedly valid, enforceable contract with VWSD.

¶ 80. Because we conclude that some aspects of the contract are ambiguous, see supra, Part III, we do not know the scope of the contract. The plain language of the agreement does not appear to cover the provision of assistance in acquiring deliverables—indeed the parties agree that

---

"[c]onsiderations of both justice and efficiency require that . . . the parties' own definition of their respective obligations . . . take precedence over the obligations that the law would impose in the absence of agreement." Id. Thus, for unjust-enrichment and quantum-meruit claims, it is both true that the existence of an express agreement is not an automatic bar to recovery, Soon Kwon, 2019 VT 59, ¶ 27, and the existence of an express agreement on the subject matter of an unjust-enrichment or quantum-meruit claim ordinarily precludes recovery, Matteo, 2021 VT 81, ¶ 29.

We also note that some jurisdictions have held that a plaintiff has no basis to recover for unjust enrichment where any adequate remedy at law is available. See, e.g., Popponesset Beach Ass'n, v. Marchillo, 658 N.E.2d 983, 988 (Mass. App. Ct. 1996) (concluding that available statutory remedy meant plaintiff could not claim unjust enrichment); see also In re Gen. Motors LLC Ignition Switch Litig., 257 F. Supp. 3d 372, 419 (S.D.N.Y. 2017) (stating that under Massachusetts law, plaintiff is prohibited from brining unjust-enrichment claim "where an adequate remedy at law exists—regardless of the viability of that theory or whether it sounds in contract, fraud, or tort"). In this case, the arguments pertain to the existence of a contract, so the impact of the availability of legal remedies more broadly remains for another day.

the written agreement did not provide for such assistance. Further, the rights and remedies of the parties in the event of minor and major breaches are ill-defined. The determination of the contract-interpretation questions remaining above is material for the outcome of this claim. Accordingly, we are unable to determine whether the subject matter of the express agreement encompass that of Beldock's unjust-enrichment claim. See Tate v. Am. General Life Ins. Co., No. RDB-21-02726, 2022 WL 4225485, at *11 (D. Md. Sep. 13, 2022) (mem.) (denying motion to dismiss unjust-enrichment claim despite existence of valid contract where plaintiff made plausible arguments that policies in contract were ambiguous). Summary judgment therefore cannot be sustained on a theory that the claim addresses the same subject matter as the Beldock contract.

### iii. Unjust

¶ 81.    Lastly, because material facts are in dispute, the trial court's determination that VWSD's enrichment was not unjust was premature. "The most significant requirement for a recovery on quasi contract is that the enrichment to the defendant be unjust." Ray Reilly's Tire Mart, Inc. v. F.P. Elnicki, Inc., 149 Vt. 37, 40, 537 A.2d 994, 995 (1987) (quotation omitted). "The proper inquiry is whether, in light of the totality of circumstances, it is against equity and good conscience to allow defendant to retain what is sought to be recovered." DJ Painting, Inc., 172 Vt. at 243, 776 A.2d at 417 (quotation omitted). The trial court's conclusion on this point was premised on its determination that Beldock breached the contract when he did not pay and therefore VWSD was free to remarket the assets. For the reasons stated above, we conclude that a question of fact remains as to whether Beldock breached the contract because the agreement is ambiguous concerning when payment was due. Without fully understanding the parties' obligations under the contract, we cannot evaluate whether the totality of the circumstances demonstrates that allowing VWSD to retain any benefits conferred on it is equitable. It was accordingly inappropriate to grant summary judgment in favor of VWSD on the grounds that Beldock himself breached the agreement and therefore could not recover for unjust enrichment.

37

## VII.  Conclusion

¶ 82.   We conclude that the contract between Beldock and VWSD is ambiguous. Accordingly, its interpretation is a question of fact, and summary judgment on both Beldock's claim and VWSD's counterclaim for breach of contract must be reversed.  However, summary judgment in favor of VWSD was appropriate on Beldock's claim for breach of the implied covenant of good faith and fair dealing because the conduct he alleges is violative cannot sustain his claim as a matter of law.  On Beldock's claim for tortious interference with contract against Green Lantern and Shullenberger, we conclude that Green Lantern's nonbinding offer for a backup plan in the event the Beldock contract was validly terminated was not improper interference and therefore summary judgment in favor of the two defendants was proper.  Lastly, Beldock's unjust enrichment claim against Green Lantern and Shullenberger fails as a matter of law because our case law does not require individuals to pay twice for the same service.  However, Beldock's unjust enrichment claim against VWSD may proceed because disputed material facts prevent the grant of judgment as a matter of law.

Reversed and remanded for further proceedings consistent with this opinion.

FOR THE COURT:

_____

Associate Justice