Filed 12/22/23

VERMONT SUPERIOR COURT
Orleans Unit
247 Main Street
Newport VT 05855
802-334-3305
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 21-CV-02717

| Gary Lavine et al v. Steppy Traber et al |
| --- |

# FINDINGS, CONCLUSIONS, AND JUDGMENT

This is a construction contract dispute involving a homeowner and a contractor and claims arising the construction of a deck. The matter came before the Court for a bench trial on December 15, 2023. Both parties were present. Following the testimony from the parties and the admission of relevant evidence, the Court grants judgment for Plaintiff Lavine on the breach of contract issue but finds no basis to conclude that Defendants Steppy and Miranda Traber committed either consumer fraud or a breach of the covenant good faith and fair dealing. This decision is based on the following findings and conclusions.

*Findings*

Plaintiff Gary Lavine owns a residential property on Route 14 in Craftsbury, Vermont. In December of 2020, he sought to hire a contractor to build a deck along the side of his house over a steeply banked area. Lavine wanted a deck that was wide enough to accommodate wheelchairs and that could sustain a large hot tub. Lavine looked on the internet and found Defendants Steppy and Miranda Trabers' website. At that time, the Trabers were calling themselves Master Construction. None of the evidence submitted indicates that the Trabers represented themselves as a corporate entity.

While the name "the Master Construction" was not registered with the Vermont Secretary of State, the Trabers appear to have been using it as a trade-name. Apart from the website and the initial estimate document, however, the Trabers acted as individuals. The contact information on the website identified them by name. All payments were made out to Stebby Traber, and all of Lavine's dealings were with Steppy Traber, usually on site. There is little evidence that the Trabers, apart from the trade

name, held themselves out as anything other than contractors who offered to construct Lavine's deck themselves.[1]

The parties did not draft or execute a written contract to cover the proposed work, but the evidence indicates that the Trabers developed three estimates for the work ranging between $9,000 and $16,000 and a separate $4,000 estimate for the necessary concrete work. As part of the estimating process, Lavine gave the Trabers specific requirements and dimensions for the deck. This included a depth of 14 feet and a length of 61 feet. The deck needed to be wide enough for wheelchairs as Lavine provides home care for older individuals, many of whom are confined to a wheelchair. While the Trabers denied being aware of these details, Lavine's testimony was persuasive, particularly given the fact that these elements arose from his work and were not merely a whim, afterthought, or a developing detail—such as the eventual idea to enclose the deck. These features were part of the basic need and function of the deck from the beginning, and the Court finds that these requirements were more likely than not communicated to the Trabers during the initial meetings as part of the discussion about the scope and nature of the deck that Lavine desired the Trabers to construct for him.

In his testimony, Lavine spoke about the representations that the Trabers made to Lavine about their 0construction experience and experience building decks. The testimony of the Trabers supports this statement, but like many representations the details are more telling. At trial, Steppy Traber stated that he had worked on many construction projects throughout his life and had worked on the construction of decks, but the testimony indicated that much of this experience has been limited to working on construction crews and that his experience as a general contractor was limited and did not involve the construction of a large deck. In fact, the evidence indicates that Steppy Traber had never before managed a construction project of this size or with such details.

The evidence of the Trabers representations on the website and to Lavine in their early meetings indicates that the Trabers were skirting the line of truth. Nothing that they represented to Lavine appears to be outright false. Instead, the experience appears to be embellished and puffed—a variation on the fake-it-until-you-make-it philosophy—that the Trabers used to bill themselves as more experienced and capable contractors than they actually were. At the same time, Steppy Traber did not

---

[1] While Miranda Traber was listed on the website and assisted with at least one of the pre-construction meetings, she does not appear to have performed any of the actual stie work. Nevertheless, there is no dispute that she was a participant in Stebby Traber's business and was a party to the construction agreement with Lavine. *Winey v. William E. Dailey, Inc.*, 161 Vt. 129, 139 (1993) (noting that a wife is not normally responsible for a breach of contract by her husband unless she is a party to that contract).

completely overbill himself. He has experience as a construction worker and has built decks with other crews. It appears that he has some limited experience as a general contractor.

Any illusions that the Trabers may have projected through their early representations were quickly shattered by the actual work product. The photographic evidence shows poor construction throughout the deck and foundation. This included several easily observed issues—the small-sized sono-tubes; the haphazard placement of foundation posts; the post that leaned at an alarming angle from base to the deck; and the use of posts of various-sized lumber—some of which appear to have been cobbled together from scrap pieces and joined in the middle. The deck frame itself was sub-quality. Corners of the rim joist did not connect. Key parts of the deck were held together by lag bolts on which a significant portion of the weight of the deck would sit. Joists were placed at irregular distances with some resting on posts rather than running from the ledger board to the rim joist. Traber laid particle board down as decking material, which quickly dissolved in Vermont's wet weather conditions. It also turned out that Traber built the deck two feet too narrow, which would have prevented wheelchairs from navigating the deck area.

Lavine described his growing awareness of these issues, but he admitted that when he raised these issues, Steppy Traber would either repair the specific issue or would provide an explanation that Lavine found plausible. During this time, Lavine made a series of installment payments to Traber. There were four in total: (1) March 20, 2021 for $4,000; (2) April 5, 2021 for $4,000; (3) April 19, 2021 for $4,350; and (4) May 8, 2021 for $4,320. In total, Lavine paid the Trabers $16,670 for their work on the deck.[2]

On May 8, 2021, Lavine gave Steppy Traber the fourth installment check, and Traber left the work site. He never returned. After a few weeks, Traber came and collected his tools, but he did not perform any further work. The Lavines made numerous efforts to contact the Trabers to bring them back to the site to continue working on the deck, but by the summer of 2021, it became clear that they would not return. Steppy Traber testified that he did not return because he was dealing with mental health issues, none of which had anything to do directly with the Lavines. The Trabers admit that

---

[2] None of these payments included a formal review or approval of the work done. As Lavine explained, the payments were usually triggered by Steppy Traber's need for more materials. In this respect, the course of dealing between the parties shows that the payments made were for future work and supplies, and the money Lavine paid enabled Steppy Traber to purchase more lumber or other supplies as he ran out. The Trabers admitted that these payments were deposited in an account to which both Steppy and Miranda Traber had access and from which both benefited.

neither Steppy nor Miranda Traber adequately communicated with Lavine and did not provide closure on the project or contract. They simply walked away from it.

Following the Trabers' departure and Lavine's inability to bring them back, Lavine began interviewing new contractors. He hired a new contractor who took over the deck project. The new contractor tore out all of the Traber work and began with a whole new foundation, new framing work, and effectively started the project from scratch. From the evidence, this decision was necessary. As the Court has described above, the foundation and posts of the Traber-built deck were unstable and irregular. The deck was never completed, and the framing had serious issues from the manner that Traber installed the joists to the gabs and irregular fit of the frame. What decking was laid appears to have been improper and was quickly decomposing and destabilizing. In light of these structural and foundational issues, the evidence indicates that Lavine acted in a reasonable manner to allow the new contractor to tear out the Traber-work and to start over. In this process, the Traber-provided materials were necessarily lost.

Comparing the pictures of the two decks, this decision was not only reasonable, but it appears to be the only reasonable decision. The Traber built deck did not appear to be a professional product. It lacked the basic uniformity and precision that professional carpenters use to ensure that the surface of the deck is stable and safe. Comparing the joists of the two projects illustrates this point. The Traber-built deck frame has joists running at different widths between them and running into posts or other spots rather than from ledger to rim joist. None of them look stable or safe. The successor deck had a precise line of joists running at equidistant widths from the ledger along the house to the rim joist with both uniformity and precision, ensuring that each square foot of the deck surface is supported by a nearby joist. The distinction is striking and not easily missed, even to the untrained eye.

Based on the evidence and testimony, the Court finds that the Traber-built deck frame and foundation was of little to no value and was necessarily lost when the successor contractor worked to correct the issue and built a deck that conformed with the Lavine's consistently stated needs.

*Legal Conclusions*

Lavine's first claim is breach of contract. The Court concludes that Lavine has established this claim. Lavine and the Trabers entered into an oral agreement in early 2021. The terms of this oral agreement were that Traber would build a 14-foot by 61-foot-wide deck for Lavine that could support wheelchairs and a hot tub. In return, Lavine would make regular installment payments to Traber

consistent with the Trabers' estimates but ultimately governed on a time and materials basis. The payments would come in advance of the work, and each payment would purchase the next set of time and materials as the Trabers did not prepare or submit invoices for their work. The evidence is that Lavine paid the Trabers $16,670, and he received nothing of value for this money. The Trabers abandoned the project before it was complete, and Lavine was forced to hire a new contractor who effectively had to remove and replace all of the Trabers' work.

To establish a claim for a breach of contract, a plaintiff must establish that there was an agreement between the parties, that the defendants breached the agreement, and that as a result of the breach, the plaintiff suffered direct or indirect damages. *Beldock v. VWSD, LLC*, 2023 VT 35, ¶¶ 23–29 (outlining the elements and issues in a breach of contract claim); *Smith v. Country Village Intern., Inc.*, 2007 VT 132, ¶ 9 (holding that a breach of contract claim requires plaintiff to establish direct or indirect damages flowing from a breach of contract to sustain such a claim).

In this case, the parties had an agreement, and the Trabers breached it. They breached it in two ways. First, they failed to build a deck to Lavine's specifications or in a professional and proper manner. Their work product was flawed and unsafe. Second, the Trabers walked off the job site before the work was complete and after accepting a payment for materials and labor that were never provided. As a result of these breaches, Lavine had nothing of value to show for his payments, and he is entitled to the return of all funds paid. Therefore, the Court concludes that Lavine is entitled to a full refund of his payment in the amount of $16, 670 for the Trabers' two breaches of contract.

As to the issue of consumer fraud and breach of the covenant of good faith and fair dealing, the Court concludes that there is insufficient evidence to trigger liability. For a consumer fraud claim, a plaintiff must establish three elements: (1) there must be a representation, practice, or omission likely to mislead the consumer; (2) the consumer must be interpreting the message reasonably under the circumstances; and (3) the misleading effects must be material, that is, likely to affect the consumer's conduct or decision with regard to a product. *Gregory v. Poulin Auto Sales, Inc.*, 2012 VT 28, ¶ 12. In this case, the Trabers did not expressly mislead. They billed themselves as having more experience than they did, but they did not make such extreme representations that the Court can conclude there was an intent to mislead or create the type of reliance that the consumer fraud statute envisions. In this case, the representations on the Trabers' website did not include specific and false representations. Lavine's testimony indicated that he was won over more by Traber's positive attitude and interest in the project. In fact, it appears that this attitude was what kept Lavine in the agreement and trying to

work with Traber even when the objective evidence of his work suggested that Traber was not performing to basic construction standards. For these reasons, the Court concludes that the elements of consumer fraud are not met in this case.

The analysis and result are similar for the claims of breach of good faith and fair dealing. The clause of good faith and fair dealing is implied in every contract. *Beldock*, 2023 VT 35, at ¶ 52. The covenant states that each party to a contract promises not to do anything to undermine or destroy the other's rights to receive the benefit of the agreement. Id. When both a breach of contract claim is advanced as well as a breach of the covenant of good faith and fair dealing, the facts underlying each claim must be different and distinguishable. Id. at ¶ 53. This is to say that a breach of contract does not in and of itself give rise to a breach of the covenant of good faith and fair dealing claim. The latter must have separate and additional support. In this case, the Trabers' mistakes, while significant, are still primarily breaches of contract. They did not perform to the standards of the contract, and they failed to complete the project. Lavine's claim that these actions also constitute a breach of the covenant of good faith and fair dealing are insufficient to sustain this as a separate and distinct claim. As such, the claim cannot proceed and is denied.

## ORDER

Based on the foregoing, it is Ordered and Adjudged that Plaintiff Gary Lavine shall have judgment against Steppy and Miranda Traber for breach of contract in the amount of $16, 670. As prevailing party, Lavine is entitled to reasonable court costs and fees. Plaintiff shall prepare a final judgment including these costs for review and adoption by the Court.

Electronically signed on 12/21/2023 2:09 AM pursuant to V.R.E.F. 9(d)

_____
Daniel Richardson
Superior Court Judge